**UNITED STATES v. BAILES et al.**
No. 562.

United States District Court
S. D. West Virginia,
Charleston Division.
April 12, 1954.

Duncan W. Daugherty, U. S. Atty.,
Huntington, W. Va., William T. Lively,

Asst. U. S. Atty., and Elmer H. Dodson, Charleston, W. Va., Asst. U. S. Atty., for the government.

D. L. Salisbury and M. E. Boiarsky, Charleston, W. Va., for defendants.

WATKINS, District Judge.

This action is now before the court upon motion to dismiss the indictment. The indictment is in one count and charges that 37 defendants "did conspire with each other, and with other persons unknown to the grand jury, to unlawfully injure, oppress, threaten and intimidate" 58 named persons, "all citizens of the United States in the free exercise and enjoyment of rights, and because of their having exercised rights, secured to them by laws of the United States, in violation of Section 241, Title 18, United States Code, in this that" continuously from the 15th day of September, 1952, to and including the 20th day of October, 1953, in Clay County, West Virginia, defendants "did conspire with each other, and with other persons whose names are unknown to the grand jurors, to separately and severally" unlawfully injure, oppress, threaten and intimidate said citizens in the free exercise and enjoyment of the right "to refrain from self organization", the right "to refrain from forming labor organizations", the right "to refrain from joining labor organizations", the right "to refrain from assisting labor organizations", and the right "to refrain from engaging in concerted activities for the purpose of collective bargaining, and other mutual aid and protection", all as set forth in paragraphs 1 through 5 of the indictment, and because of their having exercised such rights, as set forth in paragraphs 6 through 10 of the indictment. The indictment further alleges that such rights are secured to said citizens by Title 29, Section 157, United States Code, as amended [29 U.S.C.A. § 157], * * *.

The indictment further alleges that "at the time and place alleged the victims, * * * all citizens of the United States, were then and there engaged as employees of Elk River Coal and Lumber Company, a corporation, * * * in the mining of coal, which coal was transported in commerce, and was used in the production of goods for commerce, so that any injury, oppression, threat and intimidation of the said employees in the free exercise and enjoyment of the rights and privileges, and because of their having exercised the rights and privileges herein set out, by any of the defendants named herein, did tend to lead to labor disputes, burdening and obstructing the commerce and free flow of the commerce in the coal produced by the said company and the said employees, and in the production of goods for commerce from the State of West Virginia to other states."

The first ground assigned by defendants is that the indictment is duplicitous, and therefore bad because it charges two offenses in the same count, namely, (1) a conspiracy to injure, oppress, threaten and intimidate persons in the free exercise of their rights (as alleged in paragraphs 1 through 5 of the indictment), and (2) a conspiracy to injure, oppress, threaten and intimidate persons because of their having exercised rights (as alleged in paragraphs 6 through 10 of the indictment) allegedly secured to them by the laws of the United States. Defendant relies on Rule 8(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which requires that each offense charged in an indictment be stated in a separate count. There is no merit in this contention for the reason that the offense charged is a conspiracy and a single count in an indictment for conspiracy to commit two or more substantive offenses is not bad for duplicity. Center v. United States, 4 Cir., 96 F.2d 127; Blum v. United States, 6 Cir., 46 F.2d 850; United States v. Renken, D.C.W.D.S.C., 55 F.Supp. 1, 5.

Second, the defendants say that the indictment fails to allege that the alleged victims were within the coverage of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq. They point out that the Labor Management Act, 1947, does not reach all industries

but only those in or affecting interstate commerce, and only employees of employers whose activities may be said to fall within the purview of such commerce, are within the Act's coverage. Defendants say that in this indictment there is no averment that the alleged victims were employees of an employer engaged in or affected by interstate commerce so as to bring the employer or the employees within the meaning of either "employees" or "commerce" as defined by the Act. They cite as authority United States v. Berke Cake Co., D.C.E.D.N.Y. 1943, 50 F.Supp. 947. It seems to me that the provisions of the indictment set forth in the second paragraph of this opinion are sufficient in this respect, although the indictment might have gone further and alleged that the alleged victims were "employees within the coverage of the Act."

Third, defendants say that the indictment is bad because it is vague and fails to state essential facts constituting the offense charged. Rule 7(c) of the Federal Rules of Criminal Procedure requires that the indictment contain the essential facts constituting the offense charged. There is no requirement in Section 241 of Title 18 U.S.C.A. that the persons accused do any overt acts pursuant to the conspiracy. Section 241 reads as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

Title 29, Section 157, U.S.C.A. is a part of the Labor Management Relations Act (generally known as the Taft-Hartley Act). It provides as follows:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

Section 158 of the same Act provides that it shall be an unfair labor practice for an employer, a labor union or its agents to restrain or coerce employees in the exercise of the rights guaranteed in Section 157. Section 160 provides the remedy, giving the National Labor Relations Board authority to enter orders requiring that such unfair labor practices be stopped. Hereafter in this opinion the Labor Management Relations Act is sometimes referred to as the Taft-Hartley Act.

Rule 7(c) of the Federal Rules of Criminal Procedure requires that the indictment contain the essential facts constituting the offense charged. The defendants say that this indictment fails to allege a single material factual ingredient of the alleged offense. They say that it apprises them only that they did conspire with each other to unlawfully oppress, threaten and intimidate the victims in the free exercise of certain rights, but that the indictment is wholly silent as to what they did to interfere with the exercise of such rights. They say all the indictment does is to allege conclusions of law, rather than the essential facts constituting the offense charged, and that without the essential facts they are unable to know with what they are charged, and are unable to prepare their defense. They point out that in other prosecutions under Section 241,

such as Williams v. United States, 5 Cir., 179 F.2d 644, the court pointed out at page 647 of the opinion that details were alleged, such as intended assaults, beatings and torture to get confessions. Defendants say that no such facts are alleged here, and that the indictment does not inform them whether the wrongful acts consist of injury or verbal intimidation, and the alleged conspiracy covers a period of more than one year. The defendants point out that in the complaints filed under Sections 157 and 158 of the Labor Management Relations Act, the party accused is not only told that he restrained and coerced employees in the exercise of rights guaranteed under Section 157, but is told what the violation consists of, such as polling employees with reference to a representative election, or by demonstrations, displays and exercise of force, by acts of violence or by depriving employees of freedom of movement. While it is true that particularization and detail are not required, it is necessary that the indictment shall "clearly inform the defendant of the precise offense with which he is charged so that he may prepare his defense and so that a judgment thereon will safeguard him from a subsequent prosecution for the same offense." Barron, Federal Practice and Procedure, Vol. 4, Sec. 1914, p. 63.

The government contends that the indictment is in the language of the statute. Sometimes it is not sufficient to draw an indictment in the language of the statute. That was pointed out in Williams v. United States, supra, 179 F.2d at page 654.

For the reasons stated above and for the reason that the word "willfully" does not appear in the indictment (the significance of which is later mentioned in this opinion) there has been doubt in my mind as to the sufficiency of this indictment. However, after giving the matter considerable thought, I am constrained to hold that the indictment is sufficient.

Fourth, the defendants say that Section 241 violates the due process clause of the Fifth Amendment to the Constitution of the United States and also the Sixth Amendment which secures to accused persons the right to be informed of the nature and cause of the accusations against them. Defendants argue that the statute is vague and uncertain and provides no ascertainable standard of guilt, and, therefore, violates the Fifth and Sixth Amendments. Does Section 241 afford legislative due process in defining the crime? There is authority to the effect that both Sections 241 and 242, when considered by themselves, fail to fix an ascertainable standard of guilt, and are therefore unconstitutional. Sections 241 and 242 of the present United States Code are the same as Sections 51 and 52 of the United States Code, 1946 Ed., and the same as Sections 19 and 20 of the Criminal Code.

Section 242 provides:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both."

Section 242 originated in the Civil Rights Act of 1866, 14 Stat. 27, Section 241 in the Enforcement Act of 1870, 16 Stat. 141, Section 6. The real purpose of both sections was to strike at discrimination, particularly against Negroes. Section 241 was aimed at the deprivation of the civil rights of a citizen by another person, and Section 242 was aimed at deprivation of political rights of any individual by state action, as where an officer acts under color of law. In his concurring opinion in the case of Screws v. United States, 325 U.S. 91, 119, 65 S.Ct. 1031, 1044, 89 L.Ed.

1495, Justice Rutledge, speaking of these two sections, said:

"Sections 19 and 20 are twin sections in all respects that concern any question of vagueness in defining the crimes. There are important differences. Section 19 strikes at conspiracies, Section 20 at substantive offenses. The former protects 'citizens', the latter 'inhabitants'. There are, however, no differences in the basic rights guarded. Each protects in a different way the rights and privileges secured to individuals by the Constitution. If one falls for vagueness in pointing to these, the other also must fall for the same reason. If one stands, so must both. It is not one statute therefore which we sustain or nullify. It is two."

In that case it was contended that Section 242 was unconstitutional because it did not fix an ascertainable standard of guilt. The majority opinion stated:

" * * * The constitutional requirement that a criminal statute be definite serves a high function. It gives a person acting with reference to the statute fair warning that his conduct is within its prohibition."

" * * * In the instant case the decisions of the courts are, to be sure, a source of reference for ascertaining the specific content of the concept of due process. But even so the Act would incorporate by reference a large body of changing and uncertain law. That law is not always reducible to specific rules, is expressible only in general terms, and turns many times on the facts of a particular case. Accordingly, it is argued that such a body of legal principles lacks the basic specificity necessary for criminal statutes under our system of government. Congress did not define what it desired to punish but referred the citizen to a comprehensive law library in order to ascertain what acts were prohibited. To enforce such a statute would be like sanctioning the practice of Caligula who 'published the law, but it was written in a very small hand, and posted up in a corner, so that no one could make a copy of it'. Suetonius, Lives of the Twelve Caesars, p. 278". 325 U.S. 96, 65 S.Ct. 1033.

However, the court held that the word "willfully" in Section 242 was all that saved it from invalidity. It held that the constitutional requirement of certainty "is met when a statute prohibits only 'willful' acts * * *. One who does act with such specific intent is aware that what he does is precisely that which the statute forbids". The word "willfully" or "intentionally" does not appear in Section 241, or in the indictment in this case.

In a dissenting opinion Justices Roberts, Frankfurter and Jackson say that the word "willfully" in the statute does not save it. They state:

"This intrinsic vagueness of the terms of § 20 surely cannot be removed by making the statute applicable only where the defendant has the 'requisite bad purpose'. Does that not amount to saying that the black heart of the defendant enables him to know what are the constitutional rights deprivation of which the statute forbids, although we as judges are not able to define their classes or their limits, or, at least, are not prepared to state what they are unless it be to say that § 20 protects whatever rights the Constitution protects? * * *."

Further it is stated:

"In subjecting to punishment 'deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States', § 20 on its face makes criminal deprivation of the whole range of undefined appeals to the Constitution. Such is the true scope of the forbidden conduct. Its domain is unbounded and therefore

too indefinite. Criminal statutes must have more or less specific contours. This has none.''

The similarity of Sections 241 and 242 is noticeable. Both relate to any right guaranteed by the Constitution.

Further quoting from the dissenting opinion:

"To suggest that the 'right' deprivation of which is made criminal by § 20 'has been made specific either by the express terms of the Constitution * * * or by decisions interpreting (it)' hardly adds definiteness beyond that of the statute's own terms. What provision is to be deemed 'specific' 'by the express terms of the Constitution' and what not 'specific'? If the First Amendment safeguarding free speech be a 'specific' provision what about the Fourth? 'All unreasonable searches and seizures are absolutely forbidden by the Fourth Amendment'. Nathanson v. United States, 290 U.S. 41, 46, 54 S.Ct. 11, 13, 78 L.Ed. 159. Surely each is among the 'rights, privileges, or immunities secured or protected by the Constitution', deprivation of which is a crime under § 20. * * * ''

" * * * We are dealing with the reach of the statute, for Congress has not particularized as the Court now particularizes. Such transforming interpolation is not interpretation.''

Again the dissenting opinion states:

"What we are concerned with here is something basic in a democratic society, namely, the avoidance of the injustice of prohibiting conduct in terms so vague as to make the understanding of what is proscribed a guess-work too difficult for confident judgment even for the judges of the highest Court in the land." 325 U.S. 157, 65 S.Ct. 1061.

After reciting the history of both Sections 241 and 242, showing that they were originally enacted to protect the right of the Negro in his newly won rights, the dissenting opinion states:

"* * * It is familiar history that much of this legislation was born of that vengeful spirit which to no small degree envenomed the Reconstruction era. Legislative respect for constitutional limitations was not at its height and Congress passed laws clearly unconstitutional. See In re Civil Rights Cases, 109 U. S. 3, 3 S.Ct. 18, 27 L.Ed. 835.''

In the recent case of United States v. Williams, 341 U.S. 70, 74, 71 S.Ct. 581, 583, 95 L.Ed. 758, where Sections 241 and 242 were under discussion, the court stated:

"The dominant conditions of the Reconstruction Period were not conducive to the enactment of carefully considered and coherent legislation. Strong postwar feeling caused inadequate deliberation and led to loose and careless phrasing of laws relating to the new political issues. The sections before us are no exception. Although enacted together, they were proposed by different sponsors and hastily adopted. They received little attention in debate. * * *''

The Screws case was one in which a violation of Section 242 (Sec. 20 of the Criminal Code) was charged in one count and a conspiracy (under the general conspiracy statute) to violate Section 242 was charged in another count. As pointed out above the conviction was affirmed by the Supreme Court by a divided court, the court holding that the word "willfully" in Section 242 saved it from invalidity. The government cites the case of United States v. Waddell, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673; Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 and Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L. Ed. 274, to support the constitutionality of Section 241, but these cases were decided prior to the Screws case.

Thereafter the Williams case arose, in which the defendants were convicted of

conspiracy under Criminal Code Sec. 19 (now Section 241). The indictment alleged that " 'acting under the laws of the State of Florida' ", the defendants " 'conspired to injure * * * a citizen of the United States and of the State of Florida, in the free exercise and enjoyment of the rights and privileges secured to him and protected by the Fourteenth Amendment * * *'." In 1947 a Florida Corporation employed a detective agency to investigate thefts of its property. The inquiry was conducted by one Williams, the head of the agency, and among the participants were two of his employees and a member of the Miami police force detailed to assist in the investigation. Certain of the company's employees fell under suspicion, and Williams and collaborators, without arresting the suspects, took them one by one to a shack on the company's premises. There the investigators subjected them to the familiar "third degree" which, after blows, kicks, threats, and prolonged exposure to a brilliant light, yielded "confessions". One of the questions raised was whether Section 19 (now 241) as here applied affords legislative due process in defining the crime. Details were alleged in the indictment as to intended assaults, beatings and torture to get confessions, or testimony against others concerning the thefts. Like the indictment in this case, the indictment did not charge willfullness, and as pointed out above the statute did not mention it. The Court of Appeals for the Fifth Circuit held that "this provision of Section 19 was not intended to include rights under the due process clause of the Fourteenth Amendment secured not to citizens only, but to everyone". [179 F.2d 648.] It held that in the conspiracy provision of Section 19 "Congress had in mind the federal rights and privileges which appertain to citizens as such and not the general rights extended to all persons by the clause of the Fourteenth Amendment". Williams v. United States, 5 Cir., 179 F.2d 644, at page 648. The Court of Appeals further held that the "teaching

of the Supreme Court in the Screws case that in the absence of the element of willfulness in the deprivation of a right under the Fourteenth Amendment there can be no ascertainable standard of guilt", should be applied with equal force to conspiracies under Section 19 (now 241) based upon deprivation of the free exercise by a citizen of rights arising out of the Fourteenth Amendment, which are often vague and obscure to laymen and difficult of discernment by judges. The Court of Appeals also held that the word "conspire" in Section 19 (now 241) did not have the force and effect of the word "willfully", necessary to make it constitutional under the doctrine of the Screws case. The indictment was dismissed, one judge dissenting. Upon appeal the Supreme Court by a divided court affirmed the dismissal upon the first ground assigned by the Court of Appeals and did not consider the question of constitutionality of Section 19. The Supreme Court gave effect to the intent of Congress and held that Congress did not intend that Section 241 should apply to the rights set out in the Fourteenth Amendment. Justice Black in his concurring opinion said that he found "it unnecessary to determine whether 18 U.S.C. (1946 ed.) § 51, now 18 U.S.C. (1946 ed., Supp. III) § 241, 18 U.S.C.A. § 241, as applied, is too vague and uncertain in scope to be consistent with the Fifth Amendment." 341 U.S. 86, 71 S.Ct. 590.

It is my opinion that the word "willfully" is necessary in the statute only in a case like the Screws case or the Williams case where the object is to deny one his right to due process of law. What constitutes "due process of law" is vague and uncertain. Where the conspiracy is one having for its purpose to violate a right secured by a statute containing a definition of the rights secured, as in this case, I do not think Section 241 is unconstitutional, even though the word "willfully" is not found in Section 241. In the case of United States v. Classic, 313 U.S. 299, 328, 61 S.Ct. 1031, 85 L.Ed. 1368, Section 20 was upheld in

its application to certain ballot box frauds committed by state officials. But in that case the constitutional rights protected were the right to vote specifically guaranteed by Art. I, Sections 2 and 4 of the Constitution. Here Section 157 of the Taft-Hartley Act sets out the rights which are alleged to have been violated.

■ Furthermore it is my opinion that the word "conspire" is equivalent to the word "willfully". In Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 251, 63 L.Ed. 561, it is stated: "* * * intent to accomplish an object cannot be alleged more clearly than by stating that parties conspired to accomplish it." The allegation that two or more conspired means that with knowledge they then agreed to do a certain act. For these reasons I do not believe that Section 241 is unconstitutional for being vague or failing to state an ascertainable standard of guilt. What I have said above also answers defendants' point that the indictment does not allege an intent to commit an offense.

The fifth point raised by the defendants is that the indictment does not charge a criminal offense against the United States. This point raises novel, interesting and important questions in the administration of civil rights legislation which require a review of the legislative history and purpose of Section 241 and of the Labor Management Relations Act, 1947, commonly called the Taft-Hartley Act.

Defendants say that no offense against the United States is charged in the indictment for the following reasons:

(1) The rights described in Section 157 of the Taft-Hartley Act are not rights arising from the substantive powers of the Federal Government. Section 241 "only covers conduct which interferes with rights arising from the substantive powers of the Federal Government". United States v. Williams, 341 U.S. 71, 73, 71 S.Ct. 582, 95 L.Ed. 758.

(2) The rights described in Section 157 are rights derived by the alleged victims as employees and are not secured to them as citizens within the purview of Section 241.

(3) The rights set forth in the indictment are not rights secured to said individuals by either Sections 157 or 158. Those Sections deal with the conduct of an employer and of labor organizations and their agents and are not directed toward conduct by persons who act in their individual capacity. The indictment is void because it alleges that the defendants conspired in their respective individual capacities rather than as an employer or a labor organization or its agents.

(4) The Federal Government has only attempted to protect or secure the rights described in Section 157, against encroachment by employers, labor unions and their agents. For their protection of such rights against interference by all other persons, the people must look to the States. United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588.

(5) Both the legislative history of the Taft-Hartley Act and express provisions in the Act manifest clear Congressional intent not to subject alleged violations of rights described in Section 157 to criminal prosecutions, procedures and penalties under Section 241.

What is now Section 241 originated as Section 6 of the Act of May 31, 1870, 16 Stat. 140, which was a statute whose chief purpose was to secure the right of Negroes to vote. In the course of passage through Congress several sections were added. One of them, Section 17, which through successive revisions, has become Section 242, was designed to secure to all persons the equal protection of the laws. United States v. Williams, supra. In the Williams case Justice Frankfurter has incorporated as an appendix to the opinion a complete comparative table of successive phraseology of the criminal rights legislation now known as Sections 241 and 242. The history and purpose of these two companion statutes was also thoroughly reviewed by Justice Douglas in the ma-

jority opinion and in concurring and dissenting opinions by other Justices. Prior to the Screws case in 1945 and the Williams case in 1951, there had been considerable uncertainty as to what rights were covered by these two sections.

As originally enacted Section 6 (now 241) read as follows:

"Sec. 6. And be it further enacted, That if two or more persons shall band or conspire together, or go in disguise upon the public highway, or upon the premises of another, with intent to violate any provision of this act, or to injure, oppress, threaten, or intimidate any citizen with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the Constitution or laws of the United States, or because of his having exercised the same, such persons shall be held guilty of felony, and, on conviction thereof, shall be fined or imprisoned, or both, at the discretion of the court,—the fine not to exceed five thousand dollars, and the imprisonment not to exceed ten years,—and shall, moreover, be thereafter ineligible to, and disabled from holding, any office or place of honor, profit, or trust created by the Constitution or laws of the United States." 16 Stat. 140, 141, ch. 114.

In the original phraseology the statute used the phrase "any right or privilege granted or secured * * * by the Constitution or laws of the United States". In the Revised Statutes of 1874–1878 the words "granted or" are omitted and merely the words "secured" used to define the rights.

It was suggested in the Screws case in the dissenting opinion of Justices Roberts, Frankfurter and Jackson and actually decided by the majority of the Supreme Court in the Williams case that the rights mentioned in Section 241 did not include all the rights mentioned in the Constitution. That was a criminal prosecution under Section 241, in which the indictment charged that " 'acting under the laws of the State of Florida' " the defendants " 'conspired to injure * * * a citizen of the United States and the State of Florida, in the free exercise and enjoyment of the rights and privileges secured to him and protected by the Fourteenth Amendment * *' ". No one would deny that the right to a fair trial, or to due process of law under the Fourteenth Amendment was not a "right or privilege" under the Constitution of the United States. Yet the Court of Appeals and the Supreme Court there held that it was not such a right or privilege that was covered by Section 241. The majority opinion of the Supreme Court stated:

"This time all the defendants were convicted; but on appeal the Court of Appeals for the Fifth Circuit reversed. It held that in the conspiracy provision of § 19 'the Congress had in mind the federal rights and privileges which appertain to citizens as such and not the general rights extended to all persons by the clause of the Fourteenth Amendment'. 179 F.2d 644, 648. In the alternative, the court concluded that a broader construction of § 19 would render it void for indefiniteness, and that there was error in the judge's charge as well as in the exclusion of evidence of the prior acquittal of three of the defendants." 341 U.S. 72, 71 S.Ct. 582. * * *

"The alternative grounds for the decision of the Court of Appeals need not be considered, for we agree that § 241 (to use the current designation for what was § 19 of the Criminal Code) does not reach the conduct laid as an offense in the prosecution here. This is not because we deny the power of Congress to enforce by appropriate criminal sanction every right guaranteed by the Due Process Clause of the Fourteenth Amendment; nor is it because we fully accept the

course of reasoning of the court below. We base our decision on the history of § 241, its text and context, the statutory framework in which it stands, its practical and judicial application—controlling elements in construing a federal criminal provision that affects the wise adjustment between State responsibility and national control of essentially local affairs. The elements all converge in one direction. They lead us to hold that § 241 only covers conduct which interferes with rights arising from the substantive powers of the Federal Government." 341 U.S. 72, 73, 71 S.Ct. 582.

It is, therefore, crystal clear that the majority opinion is based upon the primary holding of the Court of Appeals of the Fifth Circuit to the effect that the language of Section 241 relating to the rights and privileges of "citizens" refers to the "rights and privileges which appertain to citizens as such * * *", and not upon the alternate grounds for the decision of the Court of Appeals to the effect that Section 241 was unconstitutional because it was indefinite; or that there was error in the judge's charge and admission of evidence.

Judge Waller of the Court of Appeals, in his concurring opinion, referring to Section 51, which is the same as present Section 241, says:

"These and other aspects of the case strongly suggest that Section 51, which deals only with rights or privileges of a citizen—as distinguished from an inhabitant—had reference only to interference with the free exercise by the citizen of exercisable rights pertaining to citizenship as distinguished from federal rights of persons or inhabitants, and that Section 51 was intended to make illegal concerted action designed to prevent citizens from participating in politics or from exercising rights that are expressly secured by federal law to *citizens*." 179 F.2d 651.

After tracing the various revisions of Section 6, (now Section 241), the majority opinion of the Supreme Court says:

"In three of the revisions, furthermore, Congress had before it a consistent course of decisions of this Court indicating that § 6—now § 241—was in practice interpreted only to protect rights arising from the existence and powers of the Federal Government. The pattern was established by United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588. The defendants were indicted for conspiring to deprive some Negro citizens of rights secured by the Constitution. This Court affirmed the decision of the Circuit Court arresting judgment entered on a verdict of guilty. It found that counts alleging interference with rights secured by the First, Second, Fourteenth, and Fifteenth Amendments were objectionable because the rights asserted were not 'granted or secured by the Constitution or laws of the United States' within the meaning of the statute. 92 U.S. at [page] 551, 23 L.Ed. 588. The pattern set by this case has never been departed from." 341 U.S. 79, 71 S.Ct. 586.

The Supreme Court then proceeds to review the cases which have been brought under Section 241, and to comment on their holding with reference to the principle here involved. The following appears, beginning at page 79 of 341 U.S., at page 586 of 71 S.Ct.:

"Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274, was the first of seven decisions in which the Court held or assumed that the right to vote in federal elections was protected by this legislation because it was a right 'granted or secured' by the Constitution or laws of the United States. Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340; United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; and United

States v. Saylor, 322 U.S. 385, 64 S. Ct. 1101, 88 L.Ed. 1341, held that interference by private persons with the right to vote in general elections for members of Congress is an offense under § 241; in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, the statute was found applicable to the Louisiana system of primary elections for Congress.

"In United States v. Waddell, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673, interference with the right to establish a claim under the Homestead Acts brought the offender within § 241. The right did not pertain to United States citizenship; but since it was 'wholly dependent upon the act of Congress', obstructing its exercise came 'within the purview of the statute and of the constitutional power of Congress to make such statute'. 112 U.S. at [pages] 79, 80, 5 S.Ct. [35] at page 37, 28 L.Ed. 673. Similarly, the Court has held that assault upon a citizen in the custody of a United States marshal is a violation of the statute, Logan v. United States, 144 U. S. 263, 12 S.Ct. 617, 36 L.Ed. 429, and so, a citizen may not be denied the right to inform on violation of federal laws. In re Quarles, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080; Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150.

"Contrariwise, we have held that conspiracies to force citizens to give up their jobs or compel them to move out of a State are not within the terms of the statute. Hodges v. United States, 203 U.S. 1, 27 S. Ct. 6, 51 L.Ed. 65; United States v. Wheeler, 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270. And in United States v. Powell, 212 U.S. 564, 29 S.Ct. 690, 53 L.Ed. 653 we held that participants in a mob which seized a Negro from the custody of the local sheriff and lynched him were not indictable under § 241." 341 U. S. 80, 81, 71 S.Ct. 586.

It was pointed out in the footnote of the opinion that:

"In a few early cases this section was applied in lower courts to rights not arising from the relation of the victim to the Federal Government. See United States v. Hall, 26 Fed.Cas.No.15,282, page 79; United States v. Mall, 26 Fed.Cas. No.15,712, page 1147; Ex parte Riggins, C.C., 134 F. 404. Since in none of these decisions was it alleged that the defendants acted under color of State law, each is plainly inconsistent with subsequent decisions of this Court. They also run counter even to the arguments adduced in support of the conviction here."

"It is worth noting that count 1 of the indictment in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, laid a charge under § 51 (now § 241) similar to the indictment now here for review. There was a demurrer to that indictment on the ground that § 51 did not afford a legal basis for such a charge. The argument advanced by the Government to support count 1 was substantially the argument the Government now makes in this case. The demurrer was sustained and the Government did not challenge the District Court's interpretation of § 51, although the Criminal Appeals Act of 1907, 34 Stat. 1246, 18 U.S.C. (1946 ed.) § 682, now 18 U.S.C. (1950 ed.) § 3731, 18 U.S.C.A. § 3731, enabled the Government to secure review of that construction here." 341 U.S. 81, 71 S.Ct. 587.

▪ The Williams case is the only case where the Supreme Court has gone fully into the history of Section 241 and reviewed the prior decisions of the Supreme Court to show the purpose and scope of Section 241. Although it was originally enacted in 1870, it has been

little used. The Williams case holds that Section 241 is applicable, first, where the right pertains to citizenship as such or secondly where the right is " 'wholly dependent upon the act of Congress' ".

▐ The right to due process of law under the Fourteenth Amendment is a right extended to all persons irrespective of citizenship, and therefore is not a right which is inherent in citizenship and pertains to citizenship as such; neither is it a right wholly dependent for its existence upon any statute or constitutional provision, because the right to enjoy life and property is a fundamental right existing prior to the adoption of the constitution. For this reason it was held by the majority opinions in the Williams case both in the Court of Appeals and in the Supreme Court that Section 241 was not applicable. Neither court based its opinion upon the fact that there was another remedy available under Section 242.

It is urged that the Williams case is not applicable here because it related to Fourteenth Amendment rights which are protected against state but not individual action. There is no merit in this contention. Both the majority and dissenting opinion cite with approval the case of United States v. Cruikshank, supra. At page 92 of 341 U.S. at page 593 of 71 S.Ct. in the dissenting opinion by Justice Douglas, the Cruikshank opinion is cited as authority for the proposition that where the wrongful action with respect to Fourteenth Amendment rights is by individuals who did not act for a State nor under color of state authority, Section 241 does not apply. But Justice Douglas then concludes that where the wrongful action was by state officials as in the Williams case, Section 241 does apply for the reason that the Fourteenth Amendment expressly prohibits a State from denying any person due process of law, although it does not prohibit one individual from denying due process of law to another individual. It is therefore strongly indicated, even in the dissenting opinion in the Williams case, that had the wrongful act been commit-ted by individuals Section 241 would not have been applicable. Justice Douglas stated:

"Fourteenth Amendment rights have sometimes been asserted under § 19 and denied by the Court. That was true in United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588. But the denial had nothing to do with the issues in the present case. The Fourteenth Amendment protects the individual against *state action*, not against wrongs done by *individuals*. See In re Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. The Cruikshank case, like others, involved wrongful action by individuals who did not act for a state nor under color of state authority. As the Court in the Cruikshank case said, 'The Fourteenth Amendment prohibits a State from denying to any person within its jurisdiction the equal protection of the laws; but this provision does not, any more than the one which precedes it * * * add anything to the rights which one citizen has under the Constitution against another'. 92 U.S. [at pages] 554–555, 23 L.Ed. 588. There is implicit in this holding, as Mr. Justice Rutledge observed in the Screws case, supra, 325 U.S. at page 125, note 22, 65 S.Ct. at page 1047, 89 L.Ed. 1495, that wrongful action by state officials would bring the case within § 19."

The Williams case, 1951, is the last word from the Supreme Court on the scope and application of Section 241, and if it differs in any respect from prior holdings of that court or any other court, it is now the law. With reference to the applicability of Section 241 to wrongful action by individuals, as distinguished from those acting under color of law, the majority opinion and the dissenting opinion do not differ. It is only where the wrong is committed by state officers that there is substantial difference in the conclusions reached.

Applying these principles to the case under consideration, we may say that the right to refrain from joining a labor organization does not pertain to United States citizenship. It does not arise by reason of the relation of the citizen to the Federal Government. It has nothing to do with citizenship, and this is recognized in the Labor Management Relations Act itself, Section 157, where the right is defined as belonging to "employees" irrespective of citizenship. Furthermore the right to refrain from joining a labor union is not "wholly dependent upon the act of Congress" as was the right to establish a claim under the Homestead Acts in United States v. Waddell, supra [112 U.S. 76, 5 S.Ct. 36], or the right of a Federal officer to make an arrest and retain the prisoner in custody as in United States v. Patrick, C.C.M.D.Tenn., 54 F. 338. In the same category was the case of Logan v. United States, supra, where the right of a prisoner in custody of a Federal officer to safekeeping is an incidental and necessary part of the statutory power to arrest him. The right of employees to unite for their own improvement and advancement, or to refrain from so doing, is a fundamental right that existed prior to either the National Labor Relations Act, 29 U.S. C.A. § 151 et seq., or the Labor Management Relations Act. It existed prior to the adoption of the Constitution. N. L. R. B. v. Jones and Laughlin Steel Corporation, 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893; Amalgamated Utility Workers (C. I. O.) v. Consolidated Edison Co. of New York, 309 U.S. 261, 263, 60 S.Ct. 561, 84 L.Ed. 738; United States v. Moore, C.C., 129 F. 630.

In United States v. Berke Cake Co., D.C.E.D.N.Y., 50 F.Supp. 311, 312, it was held that a conspiracy to prevent employees from enforcing their rights under the Fair Labor Standards Act is not punishable under Section 19 of the Criminal Code (now 241) since rights of employees under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., are not derived from the status of employees as citizens but are independent of citizenship. There, as here, the Act in question protected employees irrespective of citizenship. There the indictment charged that the defendants did conspire " 'to injure, oppress, threaten and intimidate certain citizens of the United States * * * in the free exercise and enjoyment of, and because the aforesaid employees had exercised certain rights and privileges secured to the said employees' " by Sec. 16(b) of the Fair Labor Standards Act of 1938. The indictment then detailed the acts of defendants by which they interfered with the enjoyment of such rights. The court held:

"The section in its present form is a reenactment of the Act of May 31, 1870, 16 Stat. 141, which had for its object the punishment of offenses against rights which it was the object of the Fourteenth and Fifteenth Amendments to the Constitution to secure; that is to say, the offenses denounced by this statute were such as tended to impair or defeat, in whole or in part, rights created by the Constitution and laws of the United States in favor of citizens as such.

"The Fair Labor Standards Act has nothing whatever to do with such matters; the employees whose rights are secured thereby may or may not be citizens, and an offense against that law, if duly established, neither adds to nor subtracts from the rights which are possessed by the victims, deriving from their status as citizens, assuming all of them to be such. * * *

"If Congress intended that violations of the Fair Labor Standards Act should be penalized through resort to other statutes in addition to the Act itself, appropriate language to embody that intention would have been adopted."

The government attempts to distinguish this case upon the ground that the Fair Labor Standards Act provided a criminal penalty whereas the Labor Man-

agement Relations Act contains no criminal penalty. In my opinion this is no valid distinction.

 I see no merit in the argument of the defendants to the effect that the word "secured" in Section 241 should be interpreted to mean "created, or granted" or "exclusively secured". Nor do I see any merit in the argument of defendants that a "fundamental" right such as the right to join a labor union or to refrain from joining a labor union can not be protected or secured by Congress. Under its power to regulate commerce, Congress may pass legislation to protect, safeguard or secure such rights even though they were fundamental rights existing prior to the Constitution. Smith v. United States, 8 Cir., 157 F. 721. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831; Hague v. Committee for Industrial Organization, 307 U.S. 496, 526, 59 S.Ct. 954, 83 L.Ed. 1423; United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341. There would seem to be no doubt that in the Labor Management Relations Act Congress secured these rights against conduct of the employers, labor unions and representatives of labor unions. The question here is not whether Congress has the power to secure such fundamental rights, but whether they have secured them in the Labor Management Relations Act against the acts of individuals as charged in this indictment. This was the same question which arose in the Cruikshank case, which the Supreme Court says set the pattern for determining the scope of Section 241.

In that case the defendants were charged with conspiracy to deprive Negro citizens of rights secured under the First, Second, Fourteenth and Fifteenth Amendments in violation of Section 6 (now Section 241). Two of the counts of the indictment stated defendants' intent to hinder and prevent citizens in the free exercise and enjoyment of their "lawful right and privilege to peaceably assemble together with each other and with other citizens of the said United States for a peaceable and lawful purpose." There, as here, the defendants claimed that the indictment did not charge an offense against the United States. There, motion was made after conviction in arrest of judgment. Here the matter is raised by motion to dismiss prior to trial. The Supreme Court affirmed the action of the Circuit Court in arresting judgment, and discharged the defendants.

The court declared that such right to peaceably assemble "existed long before the adoption of the Constitution of the United States", and that it derives its source "from those laws whose authority is acknowledged by civilized man throughout the world"; and that it is "found wherever civilization exists"; that the "government of the United States when established found it in existence, with the obligation on the part of the States to afford it protection." Further the opinion says:

"As no direct power over it was granted to Congress it remains, according to the ruling in Gibbons v. Ogden, [9 Wheat. 1], 203 [6 L.Ed. 23], subject to State jurisdiction. Only such existing rights were committed by the people to the protection of Congress as came within the general scope of the authority granted to the national government."

"The first amendment to the Constitution prohibits Congress from abridging 'the right of the people to assemble and to petition the government for a redress of grievances'. This like the other amendments proposed and adopted at the same time, was not intended to limit the powers of the State governments in respect to their own citizens, but to operate upon the National government alone" * * *

"The particular amendment now under consideration assumes the existence of the right of the people to assemble for lawful purposes, and protects it against encroachment by

Congress. The right was not created by the amendment; neither was its continuance guaranteed, except as against congressional interference. For their protection in its enjoyment, therefore, the people must look to the States. The power for that purpose was originally placed there, and it has never been surrendered to the United States."

"The second and tenth counts are equally defective. The right there specified is that of 'bearing arms for a lawful purpose'. This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes", to local laws.

Applying the Cruikshank case to the facts in this case, we can say that the right of employees to organize or to refrain from organizing is not a right granted by the Constitution or laws of the United States; that such right is not dependent upon the Constitution or any law of the United States for its existence because the right existed before the Constitution or laws were adopted. For their protection in its enjoyment the people must look to the States, except so far as the States have surrendered it to the Federal Government. The States have given to the Congress the right to regulate commerce, and Congress has exercised that right in passing the Labor Management Relations Act. (Taft-Hartley Act). In Section 157 of that Act Congress has recognized and restated a right that already existed—to organize or to refrain from organizing, etc., as set forth in the statute. It then proceeds to protect or to secure such rights

against encroachment by employers, labor unions or their agents. The right was not created by the Labor Management Relations Act, neither was its continuance guaranteed, except as against interference by employers, labor unions or their representatives. For the protection of the right against interference by employers, unions and their representatives, Congress has established an elaborate procedure with remedies. For their protection of the right against interference by all other persons the people must look to the States. The power for that purpose was originally placed there and it has never been surrendered to the United States. This is the pattern set by the Cruikshank case, from which the Supreme Court says it has never departed. This is the pattern which is cited with approval in both the majority and dissenting opinions of the Supreme Court in the Williams case.

Sections 157 and 158 of Title 29 are the same as Sections 7 and 8 of the Labor Management Relations Act. Section 7 gives legislative recognition to certain rights, the violation of which by an employer, labor union or its agents shall constitute an unfair labor practice, while in Section 10 a remedy is provided. It is clear that Section 7 can not be read in isolation but must be considered together with the other provisions of the Act. When Congress recognized these rights it did not undertake to safeguard or secure such rights as against the world. In the National Labor Relations Act, 1935, (Wagner Act) it safeguarded them only against conduct of employers. In 1947 by amendment to Section 8 (Labor Management Relations Act) Congress undertook to extend such safeguards as to interference by labor unions or their agents. It is abundantly clear that any deprivation of rights by anyone other than an employer or a labor union or its agent does not fall within the protection of the amended Act. Persons acting in their individual capacities are not capable of committing an unfair labor practice. In Matter of Perry Norvell Company, 80

N.L.R.B. 225, 245, the ·National Labor Relations Board stated: " * * * Section 8(b) of the amended Act designates as unfair labor practices certain acts by a labor organization or its agents. It is not directed toward such conduct by persons or employers in their individual capacity."

 The offense charged in this indictment is not against an employer, a labor union or its agents. The indictment does not attempt to charge a conspiracy to violate a right secured under the Constitution, but is limited only to rights under the Labor Management Relations Act. The indictment does not allege that any of the 37 defendants are either employers or labor unions or their agents. The defendants are charged in their individual capacities. Congress was intending to protect interstate commerce in enacting the entire Act. The Act must be read as a whole, and Section 157 may not be lifted out of the Act and considered separately.

From the foregoing it appears first, that Section 241 is not applicable to rights described in Section 157 of the Labor Management Relations Act under the authority of United States v. Williams, supra, and, secondly, that under the plain language of the Labor Management Relations Act itself the enforcement of employee rights set forth in Section 157 against interference by individuals generally, is reserved to the States.

In the case of United States v. Cruikshank, supra, the defendants were there charged with preventing certain Negroes from enjoying their right and privilege to "peaceably assemble together with each other" * * * "for a peaceable and lawful purpose." In relation to these charges the court stated:

"The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for anything else connected with the powers or the duties of the national government, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances. If it had been alleged in these counts that the object of the defendants was to prevent a meeting for such a purpose, the case would have been within the statute, and within the scope of the sovereignty of the United States. Such, however, is not the case. The offense, as stated in the indictment, will be made out, if it be shown that the object of the conspiracy was to prevent a meeting for any lawful purpose whatever."

The above statement means that the indictment in the Cruikshank case could be proved by showing a conspiracy to prevent any lawful meeting, such as a social affair. In other words, evidence could be introduced proving such a conspiracy and the indictment would stand proved. This, of course, would have no connection with the rights existing and protected to citizens as an attribute of citizenship. The words "for such a purpose" mean for the purpose of petitioning Congress for a redress of grievances. The right to hold a meeting for such a purpose would be an attribute of citizenship, and as such, would be under the protection of the United States, for the reasons set forth in United States v. Williams, supra.

Another interesting case is United States v. Moore, C.C.N.D.Ala., 129 F. 630, where a conspiracy was charged under Section 5508, R.S. (now Section 241) to interfere with the right of coal miners to organize. The indictment charged that the defendants "conspired to injure, oppress, and intimidate" one Greer, "a citizen of the United States, to prevent the free exercise and enjoyment by him of a right or privilege secured to him by the Constitution and laws of the United States, to wit, 'the right and privilege

of establishing, organizing, and perfecting a local union of the United Mine Workers of America * * *' and that, in pursuance of the conspiracy, and to effect its object, the defendants unlawfully assaulted and beat said Greer, etc." The defendants demurred to the indictment on the ground that the right or privilege claimed was not secured to Greer as a citizen of the United States by the Constitution or laws of the United States, and therefore the indictment did not state an offense against the United States. The demurrer was sustained in a splendid opinion which quotes from the Cruikshank case, and clearly explains the difference between this type of a right and rights secured to citizens as such. The court held that the right of miners to organize was not a right or privilege coming within Section 5508 (now 241) and that the enforcement of such right depended entirely upon the States. It is true that this case arose before the enactment of the Labor Management Relations Act, but it points out clearly that as between individuals, in many matters the citizen must look to the States to protect him in the enjoyment of life, liberty, property and the pursuit of happiness. It also holds that there is nothing in the Constitution of the United States which secures this particular right.

■ But there is a further reason why this action must be dismissed. The legislative history of the Taft-Hartley Act and its predecessor, the Wagner Act, shows that Congress did not intend to subject violations of rights described in Section 157 to Federal criminal prosecution, either for the substantive offense, or under Section 241, at least insofar as deprivation of such rights by individuals generally is concerned.

In the provision of the Labor Management Relations Act making a secondary boycott an unfair labor practice the word "unlawful" was used, which was a departure from other provisions relating to unfair labor practice. During the debate in the Senate some of the Senators thought that the use of the word "unlawful" might make violators subject to punishment under the conspiracy statute of the Criminal Code. Senator Taft, who was Chairman of the Committee on Labor, and who was in charge of handling the legislation on the floor of the Senate, stated that there was no intention whatever to subject persons to a charge of conspiracy or to subject them to any criminal penalty for violating the provisions of the Act on boycotts. The discussion shows clearly that it was generally assumed that violation of the provisions of the Act would make the offender guilty of only an unfair labor practice, and would in no wise subject a person to criminal penalties.

The debate on this subject, as shown in Legislative History of the Labor Management Relations Act, 1947, Volume 2, pages 1371–1373, is as follows:

"Mr. Pepper. Mr. President, I had assumed that the Ball amendment and the Taft amendment had both, in defining the boycott or the jurisdictional strike, employed substantially the same language as is used in section 8 of the bill, where those things are made an unfair labor practice. It just dawned on me that the Senator has made it unlawful—not an unfair labor practice, but he has made it unlawful to engage in a boycott or in a jurisdictional strike. That is found in section 303(a) of the Senator's amendment:

" 'It shall be unlawful in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services in the course of their employment—'

"For the enumerated purposes set out in the amendment. Was it the desire of the Senator from Ohio to make those acts unlawful?

"Mr. Taft. That is correct. I may say that the definition is exactly the same as the definition we had of an unfair labor practice. The effect of making it unlawful is simply that a suit for damages can be brought for that kind of thing. There is no criminal penalty of any sort.

"Mr. Pepper. Mr. President, that is the point I am making. If the Senator will yield further, I should like to refer to a memorandum which I put in the Record last year, in which I called attention to the conspiracy statute, which is on the statute books of the country, providing that, if two or more people band together, or if they conspire one with another, to do an unlawful act, that is a criminal offense. I shall presently obtain the memorandum from the office of the Legislative Counsel, and I should like to call it to the attention of the Senator. But I also call attention to the fact that the Senator's amendment has been modified to make it applicable to labor organizations, not to a 'person', as it was when first submitted.

"Mr. Taft. I do not see how the conspiracy statute could apply.

"Mr. Pepper. It would always be a working together of many people to do what the Senator defines as an 'unlawful act'. I maintain that they would be subject to criminal prosecution under the Federal conspiracy statute. I think I can sustain the contention with cases. I have the memorandum here.

"Mr. Taft. I think the Senator is entirely incorrect. There is no intention whatever to subject persons to a charge of conspiracy or to subject them to any criminal penalty for such strikes, by the use of the words 'labor organization'. Furthermore, a labor organization is just like a corporation; a corporation is not itself a conspiracy, nor is a labor organization a conspiracy.

So that even on the Senator's assumption, unless there were two or three labor organizations conspiring together there could not be any possible application of the amendment to the law.

" * * * * * *

"Mr. Taft. So far as the conspiracy statute is concerned, I do not think it applied.

" * * * * * *

"Mr. Barkley. I have not examined the Criminal Code, but I recall that there is a provision to the effect that when no specific penalty is assessed against an act which is elsewhere declared unlawful a penalty may be applied as if it were made a penalized act, if the act itself, when committed, was similar to one with respect to which there is a penalty. Has the Senator looked up that statute to see whether, notwithstanding there is no specific penalty in his amendment, one might be applied under the general basic clause of the Criminal Code?

"Mr. Taft. I have looked up that matter before, and there is no such general clause, as I understand. The only question is respecting the conspiracy statute which the Senator from Florida has brought up.

" * * * * * *

"Mr. Baldwin. As I understand, what we are considering would be unlawful in the sense only that it would create a civil liability for damages. It is not unlawful in the sense that there would be any criminal liability?

"Mr. Taft. It is unlawful. There may be other results arising from it, but there would not be a criminal penalty in my opinion, because there is no criminal penalty prescribed in the amendment.

" * * * . * * *

"Mr. Taft. However, when this amendment deals with labor organizations and the only unlawfulness is for a labor organization to do some-

thing, in my opinion the labor organization is not a conspirator, and the conspiracy statute does not apply to it unless two or more labor organizations are involved. I believe that the simplest way to take care of the matter is to insert in line 2 on page 1, after the words 'it shall be unlawful' the words, 'for the purposes of this section only'. I have no intention of subjecting them to criminal liability. I now modify the amendment by inserting in line 2 on page 1, after the words 'it shall be unlawful' the words, 'for the purposes of this section only'."

There was much debate on whether to bring within the jurisdiction of the Federal Board activity which violated employees' rights described in Section 157. There is no indication that anyone intended that conduct which infringes upon Section 157 rights should serve as a predicate for criminal prosecution in Federal District Courts. It shows an intent to deal with such matters administratively under the terms of the Act. Senator Taft said:

" * * * We feel that the Board should be given the opportunity to say, 'That is an unfair labor practice and you must stop that particular practice'." Legislative History, supra, p. 1028.

There was opposition to the provision which makes it an unfair labor practice for a labor organization or its agents to coerce or restrain employees in the exercise of rights described in Section 157. Upon this matter Senator Ives said:

" * * * assuming that these proscribed acts involve violence and physical coercion, the provision is unnecessary, because offenses of this type are punishable under State and local police laws." Legislative History, L.M.R.A., 1947, p. 1021.

Again at page 1024 Senator Ives stated:

" * * * For such thing as 'goon' squads, the only answer is immediate and decisive police action, and if the authorities of the City of New York, or of any other place, are notified and do nothing about such a situation, then I have nothing but condemnation for such authorities * * *".

Senator Ives questioned whether the Federal Government should be called in to clear up matters which are strictly "police" matters, to which Senator Taft replied:

" * * * the Board may ultimately—we hope not finally—but may ultimately have to go to a court and obtain an injunction against practices which amount to violations of the law." Page 1024.

Again Senator Taft explained:

" * * * An accused party will be summoned before the Board. There will be a hearing as to why they were doing these things, and a cease-and-desist order may be issued. *So far as I know, there is no other penalty.*" (Italics supplied).

"If they should disobey the cease-and-desist order, the Board can obtain an injunction; and if they violate the injunction, they are liable for contempt. *That is the only result of this general charge of unfair labor practices.*" (Italics supplied).

Senator Taft made it clear that in cases of physical violence there is no reason "why there should not be two remedies for an act of that kind"—one such remedy would be before the Federal Board and the other prosecution under State law, p. 1031.

Again Senator Taft stated (p. 1208):

"I may say further that one of the arguments has suggested that in case this provision covered violence it duplicated State law. I wish to point out that the provisions agreed to by the committee covering unfair labor practices on the part of labor unions also might duplicate to some extent that State law.

Secondary boycotts, jurisdictional strikes, and so forth, may involve some violation of State law respecting violence which may be criminal, and so to some extent the measure may be duplicating the remedy existing under State law. But that, in my opinion, is no valid argument."

Senator Morse pointed out that coercive practices "which constitute a violation of local criminal laws, are and should be subject to correction by local authorities," and added that "upon a showing of force, or coercion, or intimidation the local police authority should exercise the primary jurisdiction over that type of practice." p. 1191. Again Senator Morse stated that "threats of violence are adequately covered by local and State criminal law." p. 1192. Again Senator Morse said that "such threats can be corrected under existing State laws. If measures sufficient to accomplish that result are not on the statute books, the States should pass police measures to correct that type of abuse." p. 1194. Senator Ball, a proponent of the Act, declared (p. 1199) that

" * * * the main remedy for such conditions is prosecution under State law and better local law enforcement."

Such debates show the intention of Congress. But the legislative history of the Act is also significant. The Hartley Bill (H.R. 3020), as passed by the House, contained Section 12, which denominated as an unlawful concerted activity the following:

"Sec. 12(a) (1) By the use of force or violence or threats thereof, preventing or attempting to prevent any individual from quitting or continuing in the employment of, or from accepting or refusing employment by, any employer; or by the use of force, violence, physical obstruction, or threats thereof, preventing or attempting to prevent any individual from freely going from any place and entering upon an

employer's premises, or from freely leaving an employer's premises and going to any other place; or picketing an employer's place of business in numbers or in a manner otherwise than is reasonably required to give notice of the existence of a labor dispute at such place of business; or picketing or besetting the home of any individual in connection with any labor dispute."

In the Senate such provision making such conduct an unlawful concerted activity was deleted, and the deletions were agreed to on the part of the managers of the House. Legislative History, L.M.R.A. 543–563. Courts "should not interpolate into the act" matters which Congress has purposely deleted. Rabouin v. N. L. R. B., 2 Cir., 195 F.2d 906, 912.

In the case of Amazon Cotton Mill Co. v. Textile Workers Union of America, 4 Cir., 167 F.2d 183, 188, the court said:

"There is nothing in the history of the act, the reports of committees or the debates in Congress which even vaguely supports the contention that its effect was to vest jurisdiction in the District Courts to grant relief against unfair labor practices."

A reading of the Act shows that where Congress intended a departure from administrative process, and intended to invoke other sanctions, it so provided. For example, it provided that for violation of the contract, Section 301 gave jurisdiction to Federal Courts for damage suits, and in Section 303, where there was a violation of the secondary boycott section, it provided for damage actions not only in Federal Courts but in any other court having jurisdiction of the parties.

 That the courts will look to the legislative history of the Act, the debates in Congress, and other statutory provisions to determine the intent of Congress, and then give effect to such intent is demonstrated by the case of United

States v. Williams, supra. In 50 Am. Jur.Statutes, p. 200, the following appears: "In the interpretation of statutes, the legislative will is the all important or controlling factor. Indeed, it is frequently stated in effect that the intention of the legislature constitutes the law."

The Amazon Cotton Mill Co. case was recently cited in the case of McNutt v. United Gas, Coke & Chemical Workers, D.C.W.D.Ark., 108 F.Supp. 871, 873. That was a case in which damages were claimed for a deprivation of a right existing under the laws of the United States, the action being based upon Section 241 and Section 157, the same statutes involved in this indictment. The damages grew out of a labor dispute. Plaintiff alleged " 'That the acts and actions of the defendants, together with the acts and actions of the co-conspirators aforesaid, were calculated and did deprive these plaintiffs of their right to refrain from joining United and Local No. 472 thereof' ". The court held that the Civil Rights Statute does not attempt to reach a conspiracy to deprive one of rights unless it is a deprivation of equality, of equal protection of laws, or of equal privileges and immunities under the law. Further, the court held that the violation of a right to refrain from union activities was intended by the Act to be an unfair labor practice cognizable only by the N. L. R. B. and was in no wise intended to confer jurisdiction upon United States District Courts to entertain actions predicated thereon, and in so holding, specifically, analyzed Section 157 of Title 29. In its opinion, the Court, among other things, said:

"The mere fact that a conspiracy is alleged does not aid the plaintiffs because it is not a conspiracy that affects in any way plaintiffs' equality of protection by the law or their equality of privileges and immunities under the law. There is no allegation that the defendants were trying to influence the law and the only inequality that might be inferred from the allegations of the complaint is that the defendants wrongfully assaulted plaintiffs and did not wrongfully assault anyone else."

The Court further held:

"A consideration of these two sections" (i. e., 157 and 158) "leads to the conclusion that a violation of the 'right to refrain from any or all of such activities' was intended by the Act to be an unfair labor practice cognizable only by the National Labor Relations Board and was in nowise intended to confer jurisdiction upon United States District Courts to entertain actions predicated upon Section 157."

The Court further stated:

" * * * if Congress, in enacting the Labor Management Relations Act, had intended to confer upon this Court jurisdiction of a case wherein a person's 'right to refrain from any or all of such activities' " (Section 157) "has been infringed, it would have expressly so stated in the Act as it did in Sections *301(a) and 303(b)*. The absence of such an express statement leads the Court to believe and to hold that 29 U.S.C.A., § 157, does not provide such a substantive federal right as contemplated by Rule *17(b)*, Federal Rules of Civil Procedure, * * *."

In the recent case of United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742, Judge Parker, in speaking of the Labor Management Relations Act, said:

"In the absence of anything in the act itself or in its history indicating an intention on the part of Congress to authorize the recovery of punitive damages by this highly controversial legislation, the courts would not be justified, we think, in construing it to permit such recovery. In Amazon Cotton Mill Co. v. Tex-

tile Workers Union of America, 4 Cir., 167 F.2d 183, 186, which dealt with the same statute, we quoted with approval the language of the Supreme Court in a case involving the Railway Labor Act, 45 U.S.C.A. § 151 et seq., to the effect that, ' "The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate" '. We are still of that opinion. In the light of the history of recent labor legislation, it is hardly conceivable that Congress could have intended to vest in the courts the power to punish unions by awards of punitive damages. Certainly, in the struggle over this act, which was vetoed by the President and passed by the Congress over his veto, no one ever suggested, so far as we are advised, that punitive damages could be awarded under its provisions."

Likewise it is hardly conceivable that Congress could have intended to apply the felony provisions of Section 241 under the circumstances related above. It seems unreasonable to believe that Congress would provide that the consummated violation of the rights under Section 157 would constitute only an unfair labor practice, without even a fine or any punishment as a misdemeanor, but should punish as a ten year felony the mere conspiring to do such thing. As pointed out in the debates, when there is a deprivation of such rights, it generally involves the concerted action of two or more persons. If the government is correct in its application of the law most of the unfair labor practices would constitute felonies under Section 241, and they would amount to felonies even though there was no physical violence, inasmuch as deprivation of rights by intimidation or threats is made a felony under Section 241.

The effect of such interpretation would be most serious to employees and employers alike. For example, if the owner and superintendent of a company would agree to discharge an employee or otherwise intimidate or coerce him because of union activity, and subsequently discharge him for that reason, they would be subject to as much as ten years imprisonment. If that is the effect of the Act, it is time that both labor, management, and Congress should know it. The Wagner Act was passed in 1935 and the Taft-Hartley Act was passed in 1947. There have no doubt been thousands of cases involving unfair labor practices under both Acts, but to this date there is no record of any case where anyone has given the Act this construction. What the government is trying to do is to prosecute an unfair labor practice as a Federal criminal conspiracy. In fact, what is charged in the indictment does not amount to an unfair labor practice, because, under the Act, the things charged amount to an unfair labor practice only when committed by an employer, a union or its agents.

[redacted] Nothing that I have said in this opinion is intended to minimize the seriousness of any situation where there have been acts of violence. The guilty persons should be punished. The remedy is prompt and vigorous prosecution in the State courts, and that is the only remedy, as pointed out by Senator Taft and others in the Senate. The enforcement of the general criminal laws is a local matter with responsibility resting squarely upon the city, county and state officials. Federal courts have no jurisdiction over ordinary acts of violence, because such acts are offenses only against the State and are not offenses against the Federal Government, which can be prosecuted in the Federal Courts. That is as it should be. Government should be as small in scope and as local in character as possible.

As the acts charged do not constitute an offense against the laws of the United States, the motion to dismiss the indictment is sustained.