## EX PARTE YARBROUGH, Petitioner.

### ORIGINAL.

Argued January 23d, 24th, 1884.—Decided March 3d, 1884.

*Constitutional Law—Indictment—Jurisdiction.*

This court has no general authority to review on error or appeal the judgments of Circuit Courts in cases within their criminal jurisdiction.

When a prisoner is held under sentence of a court of the United States in a matter wholly beyond the jurisdiction of that court, it is within the authority of the Supreme Court, when the matter is properly brought to its attention, to inquire into it, and to discharge the prisoner if it be found that the matter was not within the jurisdiction of the court below.

Errors of law committed by a Circuit Court which passed sentence upon a prisoner, cannot be inquired into in a proceeding on an application for *habeas corpus* to test the jurisdiction of the court which passed sentence.

An indictment which charges in the first count that the defendants conspired to intimidate A. B., a citizen of African descent, in the exercise of his right to vote for a member of the Congress of the United States, and that in the execution of that conspiracy they beat, bruised, wounded, and otherwise

maltreated him ; and in the second count that they did this on account of his race, color, and previous condition of servitude, by going in disguise and assaulting him on the public highway and on his own premises, contains a sufficient description of an offence embraced within the provisions of §§ 5508, 5520 Rev. Stat.

In construing the Constitution of the United States, the doctrine that what is implied is as much a part of the instrument as what is expressed is a necessity by reason of the inherent inability to put all derivative powers into words.

§ 4 of article I. of the Constitution, which declares that " the times, places, and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof, but the Congress may at any time make or alter such regulations, except as to the place of choosing senators," adopts the State qualification as the federal qualification for the voter ; but his right to vote is based upon the Constitution and not upon the State law, and Congress has the constitutional power to pass laws for the free, pure and safe exercise of this right.

Although it is true that the Fifteenth Amendment gives no affirmative right to the negro to vote, yet there are cases, some of which are stated by the court, in which it substantially confers that right upon him. *United States v. Reese,* 92 U. S. 214, qualified and explained.

Petition for a writ of *habeas corpus* for the release of several persons convicted, sentenced and imprisoned for conspiracy to intimidate a person of African descent from voting at an election for a member of Congress. The facts making the case appear in the opinion of the court.

*Mr. Henry B. Tompkins* for petitioner.

*Mr. Solicitor-General* opposing.

MR. JUSTICE MILLER delivered the opinion of the court.

This case originates in this court by an application for a writ of *habeas corpus* on the part of Jasper Yarbrough and seven other persons, who allege that they are confined by the jailer of Fulton County, in the custody of the United States marshal for the Northern District of Georgia; and that the trial, conviction, and sentence in the Circuit Court of the United States for that district, under which they are held, were illegal, null and void.

The court, on the filing of this petition, issued a rule on the

marshal, or on any person in whose custody the prisoners might be found, to show cause why the writ of *habeas corpus* should not issue for their release.

It appears, by the returns made to this rule, that the sentence of the court which ordered their imprisonment in the Albany penitentiary in the State of New York, at hard labor for a term of two years, has been so far executed that they are now in that prison. The rule having been served on John McEwan, superintendent of the penitentiary, he makes return that he holds the prisoners by virtue of the sentence of the Circuit Court for the Northern District of Georgia, and annexes to his return a transcript of the proceeding in that court.

As this return is precisely the same that the superintendent would make if the writ of *habeas corpus* had been served on him, the court here can determine the right of the prisoners to be released on this rule to show cause, as correctly and with more convenience in the administration of justice, than if the prisoners were present under the writ in the custody of the superintendent; and such is the practice of this court.

That this court has no general authority to review on error or appeal the judgments of the Circuit Courts of the United States in cases within their criminal jurisdiction is beyond question; but it is equally well settled that when a prisoner is held under the sentence of any court of the United States in regard to a matter wholly beyond or without the jurisdiction of that court, it is not only within the authority of the Supreme Court, but it is its duty to inquire into the cause of commitment when the matter is properly brought to its attention, and if found to be as charged, a matter of which such a court had no jurisdiction, to discharge a prisoner from confinement. *Ex parte Kearney*, 7 Wheat. 38; *Ex parte Wells*, 18 How. 307; *Ex parte Lange*, 18 Wall. 163; *Ex parte Parks*, 93 U. S. 18.

It is, however, to be carefully observed that this latter principle does not authorize the court to convert the writ of *habeas corpus* into a writ of error, by which the errors of law committed by the court that passed the sentence can be reviewed here; for if that court had jurisdiction of the party and of the offence for which he was tried, and has not exceeded its

powers in the sentence which it pronounced, this court can inquire no further.

This principle disposes of the argument made before us on the insufficiency of the indictments under which the prisoners in this case were tried.

Whether the indictment sets forth in comprehensive terms the offence which the statute describes and forbids, and for which it prescribes a punishment, is in every case a question of law, which must necessarily be decided by the court in which the case originates, and is therefore clearly within its jurisdiction.

Its decision on the conformity of the indictment to the provisions of the statute may be erroneous, but if so it is an error of law made by a court acting within its jurisdiction, which could be corrected on a writ of error if such writ was allowed, but which cannot be looked into on a writ of *habeas corpus* limited to an inquiry into the existence of jurisdiction on the part of that court.

This principle is decided in *Ex parte Tobias Watkins*, 3 Pet. 203, and *Ex parte Parks*, 93 U. S. 18.

This, however, leaves for consideration the more important question—the one mainly relied on by counsel for petitioners—whether the law of Congress, as found in the Revised Statutes of the United States, under which the prisoners are held, is warranted by the Constitution, or being without such warrant, is null and void.

If the law which defines the offence and prescribes its punishment is void, the court was without jurisdiction and the prisoners must be discharged.

Though several different sections of the Revised Statutes are brought into the discussion as the foundation of the indictments found in the record, we think only two of them demand our attention here, namely, sections 5508 and 5520. They are in the following language:

"Sec. 5508. If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same,

or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years; and shall, moreover, be thereafter ineligible to any office or place of honor, profit, or trust created by the Constitution or laws of the United States.

"SEC. 5520. If two or more persons in any State or Territory conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy, in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a member of the Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; each of such persons shall be punished by a fine of not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, not less than six months nor more than six years, or by both such fine and imprisonment."

The indictments, four in number, on which petitioners were tried, charge in each one, all of the defendants with a conspiracy under these sections, directed against a different person in each indictment. On the trial the cases were consolidated, and as each indictment is in the identical language of all the others, except as to the name of the person assaulted and the date of the transaction, the copy which is here presented will answer for all of them:

"We, the grand jurors of the United States, chosen, selected, and sworn in and for the Northern District of Georgia, upon our oaths, present: That heretofore, to wit, on the twenty-fifth day of July, in the year of our Lord one thousand eight hundred and eighty-three, Jasper Yarbrough, James Yarbrough, Dilmus Yarbrough, Neal Yarbrough, Lovel Streetman, Bold Emory, State Lemmons, Jake Hayes, and E. H. Green, all late of said Northern District of Georgia, did, within the said Northern District of Georgia, and within the jurisdiction of this court, commit the offence of conspiracy, for that the said Jasper Yarbrough, James Yarbrough, Dilmus Yarbrough, Neal Yar-

brough, Lovel Streetman, Bold Emory, State Lemmons, Jake Hayes, and E. H. Green did then and there, at the time and place aforesaid, combine, conspire, and confederate together, by force, to injure, oppress, threaten, and intimidate Berry Saunders, a person of color and a citizen of the United States of America of African descent, on account of his race, color, and previous condition of servitude, in the full exercise and enjoyment of the right and privilege of suffrage in the election of a lawfully qualified person as a member of the Congress of the United States of America, and because the said Berry Saunders had so exercised the same, and on account of such exercise, which said right and privilege of suffrage was secured to the said Berry Saunders by the Constitution and laws of the United States of America, the said Berry Saunders being then and there lawfully entitled to vote in said election, and having so then and there conspired the said Jasper Yarbrough, James Yarbrough, Dilmus Yarbrough, Neal Yarbrough, Lovel Streetman, Bold Emory, State Lemmons, Jake Hayes, and E. H. Green did unlawfully, feloniously, and wilfully beat, bruise, wound, and maltreat the said Berry Saunders, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America.

" *Second Count.*—And the jurors aforesaid, upon their oaths aforesaid, do further present: That heretofore, to wit, on the twenty-fifth day of July, in the year of our Lord one thousand eight hundred and eighty-three, Jasper Yarbrough, James Yarbrough, Dilmus Yarbrough, Neal Yarbrough, Lovel Streetman, Bold Emory, State Lemmons, Jake Hayes, and E. H. Green, all late of said Northern District of Georgia, within the said Northern District of Georgia and within the jurisdiction of this court, did commit the offence of conspiracy, for that the said Jasper Yarbrough, James Yarbrough, Dilmus Yarbrough, Neal Yarbrough, Lovel Streetman, Bold Emory, State Lemmons, Jake Hayes, and E. H. Green, having then and there conspired together, by force, to injure, oppress, threaten, and intimidate Berry Saunders, a person of color and a citizen of the United States of America of African descent, on account of his race, color, and previous condition of servitude, did then and there unlawfully, wilfully, and feloniously go in disguise on the highway, and on the premises of Berry Saunders, with the intent to prevent and hinder his free exercise and enjoy-

ment of the right to vote at an election for a lawfully qualified person as a member of the Congress of the United States of America, which said right had then and there been guaranteed to the said Berry Saunders by the Constitution and laws of the United States of America, the said Berry Saunders being then and there lawfully qualified to vote at said election; and having so conspired, with intent as aforesaid, the said Jasper Yarbrough, James Yarbrough, Dilmus Yarbrough, Neal Yarbrough, Lovel Streetman, Bold Emory, State Lemmons, Jake Hayes, and E. H. Green did then and there beat, bruise, wound, and maltreat the said Berry Saunders, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America.

"EMORY SPEER, *U. S. Atty.*

"A true bill. Oct. 12th, 1883.

"J. C. KIRKPATRICK, *Foreman.*"

Stripped of its technical verbiage, the offence charged in this indictment is that the defendants conspired to intimidate Berry Saunders, a citizen of African descent, in the exercise of his right to vote for a member of the Congress of the United States, and in the execution of that conspiracy they beat, bruised, wounded and otherwise maltreated him; and in the second count that they did this on account of his race, color, and previous condition of servitude, by going in disguise and assaulting him on the public highway and on his own premises.

If the question were not concluded in this court, as we have already seen that it is by the decision of the Circuit Court, we entertain no doubt that the conspiracy here described is one which is embraced within the provisions of the Revised Statutes which we have cited.

That a government whose essential character is republican, whose executive head and legislative body are both elective, whose most numerous and powerful branch of the legislature is elected by the people directly, has no power by appropriate laws to secure this election from the influence of violence, of corruption, and of fraud, is a proposition so startling as to arrest attention and demand the gravest consideration.

If this government is anything more than a mere aggregation of delegated agents of other States and governments, each

of which is superior to the general government, it must have the power to protect the elections on which its existence depends from violence and corruption.

. If it has not this power it is left helpless before the two great natural and historical enemies of all republics, open violence and insidious corruption.

The proposition that it has no such power is supported by the old argument often heard, often repeated, and in this court never assented to, that when a question of the power of Congress arises the advocate of the power must be able to place his finger on words which expressly grant it. The brief of counsel before us, though directed to the authority of that body to pass criminal laws, uses the same language. Because there is no *express* power to provide for preventing violence exercised on the voter as a means of controlling his vote, no such law can be enacted. It destroys at one blow, in construing the Constitution of the United States, the doctrine universally applied to all instruments of writing, that what is implied is as much a part of the instrument as what is expressed. This principle, in its application to the Constitution of the United States, more. than to almost any other writing, is a necessity, by reason of the inherent inability to put into words all derivative powers— a difficulty which the instrument itself recognizes by conferring on Congress the authority to pass all laws necessary and proper to carry into execution the powers expressly granted and all other powers vested in the government or any branch of it by the Constitution. Article I., sec. 8, clause 18.

We know of no express authority to pass laws to punish theft or burglary of the treasury of the United States. Is there therefore no power in the Congress to protect the treasury by punishing such theft and burglary?

. Are the mails of the United States and the money carried in them to be left to the mercy of robbers and of thieves who may handle the mail because the Constitution contains no express words of power in Congress to enact laws for the punishment of those offences? The principle, if sound, would abolish the entire criminal jurisdiction of the courts of the United States and the laws which confer that jurisdiction.

It is said that the States can pass the necessary law on this subject, and no necessity exists for such action by Congress. But the existence of State laws punishing the counterfeiting of the coin of the United States has never been held to supersede the acts of Congress passed for that purpose, or to justify the United States in failing to enforce its own laws to protect the circulation of the coin which it issues.

It is very true that while Congress at an early day passed criminal laws to punish piracy with death, and for punishing all ordinary offences against person and property committed within the District of Columbia, and in forts, arsenals, and other places within the exclusive jurisdiction of the United States, it was slow to pass laws protecting officers of the government from personal injuries inflicted while in discharge of their official duties within the States. This was not for want of power, but because no occasion had arisen which required such legislation, the remedies in the State courts for personal violence having proved sufficient.

Perhaps the earliest attempt of Congress to protect government officers while in the exercise of their duty in a hostile community, grew out of the nullification ordinance of South Carolina, and is found in the " Act further to provide for the collection of duties on imports." That act gave a right of action in the courts of the United States to any officer engaged in the collection of customs who should receive any injury to his person or property for or on account of any act done by him under any law of the United States for the protection of the revenues. And where any suit or prosecution should be commenced against him in a State court on account of any act done under the revenue laws of the United States, or under color thereof, the case might, on his petition, at any time before trial, be removed into the Circuit Court of the United States. Act of March 2d, 1833, 4 Stat. 632.

When early in the late civil war the enforcement of the acts of Congress for obtaining soldiers by draft brought the officers engaged in it into hostile neighborhoods, it was found necessary to pass laws for their protection. Accordingly, in 1863, an act was passed making it a criminal offence to assault or ob-

struct any officer while engaged in making the draft or in any service in relation thereto. 12 Stat. 731. And the next year the act was amended by making it applicable to the enrolment and resistance made thereto, and adding that if any assault on any officer or other person engaged in making such enrolment shall result in death, it shall be murder and punished accordingly. 13 Stat. 8, § 12. Under this statute Scott was found guilty of murder in the Circuit Court of the United States for the District of Indiana, and the case was brought here by a certificate of division of opinion.

It was not doubted for a moment by court or counsel that Congress had the power to pass these statutes, but it was held that serving notice of a draft, in doing which the man was killed, was not a service in the enrolment as charged in the indictment. *Scott* v. *United States*, 3 Wall. 642.

In the case of *United States* v. *Gleason*, Woolworth, 128, the defendant was convicted and sentenced to death for the murder of an enrolling officer while engaged in making the enrolment, and his sentence being commuted to imprisonment for life, he died in the Iowa penitentiary while undergoing the modified sentence. It was never suggested that Congress had no power to pass the law under which he was convicted.

So, also, has the Congress been slow to exercise the powers expressly conferred upon it in relation to elections by the fourth section of the first article of the Constitution.

This section declares that:

" The times, places, and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof ; but the Congress may at any time make or alter such regulations, except as to the place of choosing senators."

It was not until 1842 that Congress took any action under the power here conferred, when, conceiving that the system of electing all the members of the House of Representatives from a State by general ticket, as it was called, that is, every elector voting for as many names as the State was entitled to representatives in that house, worked injustice to other States which did not adopt that system, and gave an undue preponderance

of power to the political party which had a majority of votes in the State, however small, enacted that each member should be elected by a separate district, composed of contiguous territory. 5 Stat. 491.

And to remedy more than one evil arising from the election of members of Congress occurring at different times in the different States, Congress, by the act of February 2, 1872, thirty years later, required all the elections for such members to be held on the Tuesday after the first Monday in November in 1876, and on the same day of every second year thereafter.

The frequent failures of the legislatures of the States to elect senators at the proper time, by one branch of the legislature voting for one person and the other branch for another person, and refusing in any manner to reconcile their differences, led Congress to pass an act which compelled the two bodies to meet in joint convention, and fixing the day when this should be done, and requiring them so to meet on every day thereafter and vote for a senator until one was elected.

In like manner Congress has fixed a day, which is to be the same in all the States, when the electors for President and Vice-President shall be appointed.

Now the day fixed for electing members of Congress has been established by Congress without regard to the time set for election of State officers in each State, and but for the fact that the State legislatures have, for their own accommodation, required State elections to be held at the same time, these elections would be held for congressmen alone at the time fixed by the act of Congress.

Will it be denied that it is in the power of that body to provide laws for the proper conduct of those elections? To provide, if necessary, the officers who shall conduct them and make return of the result? And especially to provide, in an election held under its own authority, for security of life and limb to the voter while in the exercise of this function? Can it be doubted that Congress can by law protect the act of voting, the place where it is done, and the man who votes, from personal violence or, intimidation and the election itself from corruption and fraud?

If this be so, and it is not doubted, are such powers annulled because an election for State officers is held at the same time and place? Is it any less important that the election of members of Congress should be the free choice of all the electors because State officers are to be elected at the same time? *Ex parte Siebold*, 100 U. S. 371.

These questions answer themselves; and it is only because the Congress of the United States, through long habit and long years of forbearance, has, in deference and respect to the States, refrained from the exercise of these powers, that they are now doubted.

But when, in the pursuance of a new demand for action, that body, as it did in the cases just enumerated, finds it necessary to make additional laws for the free, the pure, and the safe exercise of this right of voting, they stand upon the same ground and are to be upheld for the same reasons.

It is said that the parties assaulted in these cases are not officers of the United States, and their protection in exercising the right to vote by Congress does not stand on the same ground.

But the distinction is not well taken. The power in either case arises out of the circumstance that the function in which the party is engaged or the right which he is about to exercise is dependent on the laws of the United States.

In both cases it is the duty of that government to see that he may exercise this right freely, and to protect him from violence while so doing, or on account of so doing. This duty does not arise solely from the interest of the party concerned, but from the necessity of the government itself, that its service shall be free from the adverse influence of force and fraud practised on its agents, and that the votes by which its members of Congress and its President are elected shall be the *free* votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice.

This proposition answers also another objection to the constitutionality of the laws under consideration, namely, that the right to vote for a member of Congress is not dependent upon

the Constitution or laws of the United States, but is governed by the law of each State respectively.

If this were conceded, the importance to the general government of having the actual election—the voting for those members—free from force and fraud is not diminished by the circumstance that the qualification of the voter is determined by the law of the State where he votes. It equally affects the government, it is as indispensable to the proper discharge of the great function of legislating for that government, that those who are to control this legislation shall not owe their election to bribery or violence, whether the class of persons who shall vote is determined by the law of the State, or by law of the United States, or by their united result.

But it is not correct to say that the right to vote for a member of Congress does not depend on the Constitution of the United States.

The office, if it be properly called an office, is created by that Constitution and by that alone. It also declares how it shall be filled, namely, by election.

Its language is:

"'The House of Representatives shall be composed of members chosen every second year by the people of the several States, and the electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislature." Article I., section 2.

The States in prescribing the qualifications of voters for the most numerous branch of their own legislatures, do not do this with reference to the election for members of Congress. Nor can they prescribe the qualification for voters for those *eo nomine*. They define who are to vote for the popular branch of their own legislature, and the Constitution of the United States says the same persons shall vote for members of Congress in that State. It adopts the qualification thus furnished as the qualification of its own electors for members of Congress.

It is not true, therefore, that electors for members of Congress owe their right to vote to the State law in any sense

which makes the exercise of the right to depend exclusively on the law of the State.

Counsel for petitioners, seizing upon the expression found in the opinion of the court in the case of *Minor* v. *Happersett,* 21 Wall. 162, that "the Constitution of the United States does not confer the right of suffrage upon any one," without reference to the connection in which it is used, insists that the voters in this case do not owe their right to vote in any sense to that instrument.

But the court was combating the argument that this right was conferred on all citizens, and therefore upon women as well as men.

In opposition to that idea, it was said the Constitution adopts as the qualification for voters of members of Congress that which prevails in the State where the voting is to be done; therefore, said the opinion, the right is not definitely conferred on any person or class of persons by the Constitution alone, because you have to look to the law of the State for the description of the class. But the court did not intend to say that when the class or the person is thus ascertained, his right to vote for a member of Congress was not fundamentally based upon the Constitution, which created the office of member of Congress, and declared it should be elective, and pointed to the means of ascertaining who should be electors.

The Fifteenth Amendment of the Constitution, by its limitation on the power of the States in the exercise of their right to prescribe the qualifications of voters in their own elections, and by its limitation of the power of the United States over that subject, clearly shows that the right of suffrage was considered to be of supreme importance to the national government, and was not intended to be left within the exclusive control of the States. It is in the following language:

"SEC. 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State, on account of race, color, or previous condition of servitude.

"SEC. 2. The Congress shall have power to enforce this article by appropriate legislation."

While it is quite true, as was said by this court in *United States* v. *Reese*, 92 U. S. 214, that this article gives no affirmative right to the colored man to vote, and is designed primarily to prevent discrimination against him whenever the right to vote may be granted to others, it is easy to see that under some circumstances it may operate as the immediate source of a right to vote. In all cases where the former slave-holding States had not removed from their Constitutions the words "white man" as a qualification for voting, this provision did, in effect, confer on him the right to vote, because, being paramount to the State law, and a part of the State law, it annulled the discriminating word *white*, and thus left him in the enjoyment of the same right as white persons. And such would be the effect of any future constitutional provision of a State which should give the right of voting exclusively to white people, whether they be men or women. *Neal* v. *Delaware*, 103 U. S. 370.

In such cases this fifteenth article of amendment does, *proprio vigore*, substantially confer on the negro the right to vote, and Congress has the power to protect and enforce that right.

In the case of *United States* v. *Reese*, so much relied on by counsel, this court said in regard to the Fifteenth Amendment, that " it has invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is an exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude." This new constitutional right was mainly designed for citizens of African descent. The principle, however, that the protection of the exercise of this right is within the power of Congress, is as necessary to the right of other citizens to vote as to the colored citizen, and to the right to vote in general as to the right to be protected against discrimination.

The exercise of the right in both instances is guaranteed by the Constitution, and should be kept free and pure by congressional enactments whenever that is necessary.

The reference to cases in this court in which the power of Congress under the first section of the Fourteenth Amend-

ment has been held to relate alone to acts done under State authority, can afford petitioners no aid in the present case. For, while it may be true that acts which are mere invasions of private rights, which acts have no sanction in the statutes of a State, or which are not committed by any one exercising its authority, are not within the scope of that amendment, it is quite a different matter when Congress undertakes to protect the citizen in the exercise of rights conferred by the Constitution of the United States essential to the healthy organization of the government itself.

But is a waste of time to seek for specific sources of the power to pass these laws. Chancellor Kent, in the opening words of that part of his commentaries which treats of the government and constitutional jurisprudence of the United States, says:

"The government of the United States was created by the free voice and joint will of the people of America for their common defence and general welfare. Its powers apply to those great interests which relate to this country in its national capacity, and which depend for their protection on the consolidation of the Union. It is clothed with the principal attributes of political sovereignty, and it is justly deemed the guardian of our best rights, the source of our highest civil and political duties, and the sure means of national greatness." 1 Kent's Com. 201.

It is as essential to the successful working of this government that the great organisms of its executive and legislative branches should be the free choice of the people as that the original form of it should be so. In absolute governments, where the monarch is the source of all power, it is still held to be important that the exercise of that power shall be free from the influence of extraneous violence and internal corruption.

In a republican government, like ours, where political power is reposed in representatives of the entire body of the people, chosen at short intervals by popular elections, the temptations to control these elections by violence and by corruption is a constant source of danger.

Such has been the history of all republics, and, though ours

has been comparatively free from both these evils in the past, no lover of his country can shut his eyes to the fear of future danger from both sources.

If the recurrence of such acts as these prisoners stand convicted of are too common in one quarter of the country, and give omen of danger from lawless violence, the free use of money in elections, arising from the vast growth of recent wealth in other quarters, presents equal cause for anxiety.

If the government of the United States has within its constitutional domain no authority to provide against these evils, if the very sources of power may be poisoned by corruption or controlled by violence and outrage, without legal restraint, then, indeed, is the country in danger, and its best powers, its highest purposes, the hopes which it inspires, and the love which enshrines it, are at the mercy of the combinations of those who respect no right but brute force, on the one hand, and unprincipled corruptionists on the other.

*The rule is discharged, and the writ of habaes corpus is denied.*