UNITED STATES of America

v.

**Herbert GUEST, James Spergeon Lackey, Cecil William Myers, Denver Willis Phillips, Joseph Howard Sims, and George Hampton Turner.**

Crim. No. 2232.

United States District Court
M. D. Georgia,
Athens Division.

Dec. 29, 1964.

476

St. John Barrett, Dept. of Justice, Washington, D. C., Floyd M. Buford, U. S. Atty., Macon, Ga., for plaintiff.

Robert B. Thompson, Gainesville, Ga., Nickolas P. Chivilis, James E. Hudson, Athens, Ga., for defendants.

BOOTLE, District Judge.

For decision now are the defendants' motions to dismiss the indictment on the ground that it does not charge an offense under the laws of the United States. A study of the question thus raised necessitates reference to some significant historical facts and a careful consideration of a few important Constitutional principles.

■ First, it must be noted that our Federal Government is a Government of limited powers, limited in number though not in degree. It can pinpoint its birth on the calendar. There was the ineffectual attempt under the Articles of Confederation. Then, there was the gloriously successful genesis under the Constitution. While the Federal Government is supreme in its sphere, its sphere is circumscribed. Its every power stems from a written instrument, the Constitution, or does not exist. It is that Constitution and the laws made in pursuance thereof that constitute the supreme law of the land.

■ Secondly, it must be remembered that federal courts are courts of limited jurisdiction. This necessarily follows from the fact that the Federal Government, under which these courts are created, is a Government of limited powers. The federal courts have only such powers, only such jurisdiction as is conferred upon them by valid acts of Congress. There is no such thing as federal common law criminal jurisdiction. When a prosecution is brought against any person in a federal court, that person is entitled to ask under what valid act of Congress he is charged. The defendants so inquire by these motions to dismiss.

■■ Thirdly, we should remember that any statute seeking to proscribe human conduct, making criminal that which but for the statute would be unpunishable in the court where such statute is sought to be enforced, must specifically describe the conduct denounced. This is elementary in the concept of due process of law, a principle applicable to the Federal Government under the Fifth Amendment, as well as to the States under the Fourteenth.

What is being said here is not new. On many occasions courts have measured indictments like this one [1] against the principles above mentioned. There has not been found any authoritative deci-

---

1. The indictment reads:

"THE GRAND JURY CHARGES:

"Commencing on or about January 1, 1964, and continuing to the date of this indictment, HERBERT GUEST, JAMES SPERGEON LACKEY, CECIL WILLIAM MYERS, DENVER WILLIS PHILLIPS, JOSEPH HOWARD SIMS, and GEORGE HAMPTON TURNER, did, within the Middle District of Georgia, Athens Division, conspire together, with each other, and with other persons to the Grand Jury unknown, to injure, oppress, threaten, and intimidate Negro citizens of the United States in the vicinity of Athens, Georgia, in the free exercise and enjoyment by said Negro citizens of the following rights and privileges secured to them by the Constitution and the laws of the United States:

"1. The right to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of motion picture theaters, restaurants, and other places of public accommodation.

"2. The right to the equal utilization, without discrimination upon the basis of race, of public facilities in the vicinity of Athens, Georgia, owned, operated or managed by or on behalf of the State of Georgia or any subdivision thereof;

"3. The right to the full and equal use on the same terms as white citizens of the public streets and highways in the vicinity of Athens, Georgia;

"4. The right to travel freely to and from the State of Georgia and to use highway facilities and other instrumentalities of interstate commerce within the State of Georgia;

"5. Other rights exercised and enjoyed by white citizens in the vicinity of Athens, Georgia.

"It was a part of the plan and purpose of the conspiracy that its objects be achieved by various means, including the following:

"1. By shooting Negroes;

"2. By beating Negroes;

"3. By killing Negroes;

"4. By damaging and destroying property of Negroes;

"5. By pursuing Negroes in automobiles and threatening them with guns;

"6. By making telephone calls to Negroes to threaten their lives, property, and persons, and by making such threats in person;

"7. By going in disguise on the highway and on the premises of other persons;

"8. By causing the arrest of Negroes by means of false reports that such Negroes had committed criminal acts; and

"9. By burning crosses at night in public view.

"All in violation of Section 241, Title 18, United States Code."

sion which this court can construe as going so far as to hold this indictment valid.[2] On the contrary, both of the two courts whose decisions are binding upon this court have fairly recently rendered decisions which this court construes as clearly invalidating this indictment.

The statute upon which the Government relies originated as Section 6 of the Act of May 31, 1870, 16 Stat. 140. It subsequently and successively became known as Section 5508 of the Revised Statutes of 1874–1878, Section 19 of the Criminal Code of 1909, and 18 U.S.C.A. § 51, 1926 edition, and is presently 18 U.S.C.A. § 241, 1948 edition, which reads as follows:

"Conspiracy against rights of citizens.

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

Now nearly ninety five years old, this statute has been construed by the courts on several occasions. We now have it upon the authority of the court of appeals for the Fifth Circuit, and upon the authority of the Supreme Court that this statute was never intended by the Congress to embrace, and therefore does not embrace, the Fourteenth Amendment rights. Williams v. United States, 179 F.2d 644 (5th Cir. 1950); Powe v. United States, 109 F.2d 147 (5th Cir. 1940); United States v. Williams, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758

(1951). The precise holding of the court of appeals on this point in the Williams case in a clear, analytical and forceful opinion by Judge Sibley, concurred in by Judge Waller, Judge Holmes dissenting, was:

"In the conspiracy provision [section 241] the Congress had in mind the federal rights and privileges which appertain to citizens as such and not the general rights extended to all persons by the clause of the Fourteenth Amendment. The *citizen's* rights are *specifically* stated in the Constitution and statutes, and in them may be found a standard of conduct. Such was the case in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, when the right of the citizen to vote for a Congressman was involved. Ex parte Yarbrough, 110 U.S. 651, 4 S. Ct. 152, 28 L.Ed. 274, like the Classic case, involved the right of a citizen to vote; the Fifteenth and not the Fourteenth Amendment was rested upon. We are of the opinion that this provision of Sec. 19 [section 241] was not intended to include rights under the due process clause of the Fourteenth Amendment secured not to citizens only, but to everyone."

That holding of the court of appeals was affirmed by the Supreme Court in an equally clear and convincing opinion by Mr. Justice Frankfurter, who wrote,

"we agree that § 241 * * * does not reach the conduct laid as an offense in the prosecution here. This is not because we deny the power of Congress to enforce by appropriate criminal sanction every right guaranteed by the Due Process Clause of the Fourteenth Amendment; nor is it because we fully accept the course of reasoning of the court below. We base our decision on the history of § 241, its text and context, the statutory framework in which it stands,

2. The few early decisions to the contrary are rejected by the Supreme Court in foot-

note 8 in United States v. Williams, 341 U.S. 70, 81, 71 S.Ct. 581, 95 L.Ed. 758.

its practical and judicial application —controlling elements in construing a federal criminal provision that affects the wise adjustment between State responsibility and national control of essentially local affairs. The elements all converge in one direction. They lead us to hold that § 241 only covers conduct which interferes with rights arising from the substantive powers of the Federal Government."

In the Williams case both the court of appeals and Supreme Court made a detailed study of § 241 and also of its companion statute, § 242, which consecutively has been section 2 of the Act of April 9, 1866, 14 Stat. 27, section 17 of the Act of May 31, 1870, 16 Stat. 144, section 5510 of the Revised Statutes of 1874–1878, section 20 of the Criminal Code of 1909, 35 Stat. 1092, 18 U.S.C.A. § 52, 1925 edition, and now 18 U.S.C.A. § 242, 1948 edition. Attached to the opinion of the Supreme Court is a comparative table showing the successive phraseology of these two statutes.

The differences in these two Code sections are succinctly pointed out by Judge Sibley, 179 F.2d at page 647, as follows:

"Sec. 19 [now 241] differs much from Sec. 20 [now 242], though both have to do with federally secured rights. Sec. 20 [now 242] creates a misdemeanor offense; it speaks of color of law, and of 'inhabitant of any State', and of discrimination in punishment on account of alienage or color or race. It punishes acts. Sec. 19 [now 241] punishes only conspiracy; it makes no reference to Sec. 20 [now 242], or to color of law, or to State, or to race or color; it adds also a separate and independ-

ent crime, the act of two or more persons going in disguise on the highway or premises of another with the bad intent named; and the punishment is that of felony, and ineligibility to hold office. Wilfulness is not mentioned, nor is 'intent' in the defining of the crime of conspiracy. It does not protect 'inhabitants', but only 'any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States.'"

And the Supreme Court concluded:

"All the evidence points to the same conclusion: that § 241 applies only to interference with rights which arise from the relation of the victim and the Federal Government, and not to interference by State officers with rights which the Federal Government merely guarantees from abridgement by the States." 341 U.S. p. 81, 71 S.Ct. p. 587.

Actually, the court of appeals and the Supreme Court went further in the Williams case than we are called upon to go in this case because the indictment in the Williams case charged that the defendants acted under color of State law, thus incorporating the sometimes magical words from § 242. Nevertheless, the § 242 one year misdemeanor could not thus be converted into a § 241 ten year felony. The Court said:

"the validity of a conviction under § 241 depends on the scope of that section, which cannot be expanded by the draftsman of an indictment."

The indictment in the case at bar contains not the slightest suggestion of State action, the color of law ingredient necessary under § 242.[3] It would be

3. There was a series of prosecutions which have become known as "the Williams cases". One indictment was under § 241. The conviction under that indictment is the subject matter of Williams v. United States, 179 F.2d 644 (5th Cir. 1950) and United States v. Williams, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758 above cited. The indictment in that case charged in substance that the defendants acting under

the laws of the State of Florida conspired to injure a citizen of the United States and of Florida in the free exercise and enjoyment of the rights and privileges secured to him and protected by the Fourteenth Amendment, to-wit, the right not to be deprived of liberty without due process of law; the right to be secure in his person while in the custody of the State of Florida; and to be immune from

hard to imagine that Congress intended that these two sections of the same Act of 1870 apply to and cover the same rights because as Judge Sibley wrote:

"It would certainly be strange that in the same Act of 1870 the Congress should punish the *consummated* deprivation of rights by such acts as are here charged only when wilfully done, and only as a misdemeanor [under 242]; but should punish as a ten year felony with deprivation of the power to hold federal office, the bare conspiring to do such a thing though not wilfully, and with nothing more in fact done."

The inclusion of the element of conspiracy in § 241 would hardly account for an increase of nine years in the maximum punishment when we remember that the general offense of conspiracy, until recently, carried only a two year maximum sentence. Nor would the presence of the requirement of State action in § 242 and its absence in § 241 reasonably account for the more severe penalty against private defendants and the less severe penalty against those acting under color of law. When Congress enacted the Civil Rights Act of March 1, 1875, 18 Stat. 335, entitled "An Act to Protect All Citizens in their Civil and Legal Rights" held unconstitutional in the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), thus undertaking to protect Fourteenth Amendment rights generally, it prescribed as punishment forfeiture of $500 to the person aggrieved, a fine of not more than $1,000, and imprisonment ranging from 30 days to one year.

■ As the Supreme Court pointed out, to construe § 241 as embracing Fourteenth Amendment rights generally rather than the rights of federal citizens as such would be not only a new, but a distorting, construction of an old statute making for redundancy and confusion, and if we assume that the conspiracy is under color of State law it can be reached under § 242 with the aid of the general conspiracy statute. Under the construction of § 241, contended for by the Government in the Williams case and in the case at bar, any conduct punishable under § 242 with the aid of the general conspiracy statute would also be punishable under § 241, and any conduct punishable under § 241 would also be punishable under § 242 with the aid of the general conspiracy statute if we add only the element of acting under color of State law, and this notwithstanding the vast difference in the maximum punishments prescribed. Criminal statutes "must be strictly construed." Prussian v. United States, 282 U.S. 675, 677, 51 S.Ct. 223, 75 L.Ed. 610, 612 (1931). "An ambiguity in such a statute is not to be resolved by an interpretation 'to embrace offenses not clearly within the law.'" Merrill v. United States, 338, F.2d 763 (5th Cir. Nov. 24, 1964). See also Krichman v. United States, 256 U.S. 363, 367–368, 41 S.Ct. 514, 65 L.Ed.

illegal assault and battery while in the custody of persons acting under color of the laws of Florida by persons exercising the authority of the State of Florida, and the right to be tried and punished, if guilty, by due process of law under the laws of Florida. Three of the defendants, including Williams, were alleged to have, and to have conspired to use, authority under the State of Florida. It was the conviction under that indictment which the court of appeals and the Supreme Court set aside for the reasons above stated.

Williams was also convicted under an indictment drawn under § 242, it being established that he acted under color of law and the trial court having applied to § 242 the interpretation, with emphasis upon the word "wilfully", as required by the Supreme Court decision in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). That conviction was dealt with and affirmed in Williams v. United States, 179 F.2d 656 (5th Cir. 1950), and Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951).

A third case dealt with perjury, and is reported as United States v. Williams, 93 F.Supp. 922 (S.D.Fla.1950) and United States v. Williams, 341 U.S. 58, 71 S. Ct. 595, 95 L.Ed. 747 (1951).

992 (1921). Any doubt must be resolved against broadening the scope of a criminal statute. United States v. Adielizzio, 77 F.2d 841, 844 (2 Cir. 1935).

The Supreme Court, in the Williams case, buttressed its decision with an exhaustive review of its prior holdings pointing out that these decisions had established that the rights which § 241 protects from individual action are those federal rights which arise from the relationship of the individual and the Federal Government, for instance, the right to vote in general elections for Congressmen, Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884); Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915); United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915); United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944); the right to vote in Louisiana primary elections for Congressmen, United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); the right to establish a claim under the Homestead Acts, this being a right "wholly" dependent upon an Act of Congress, United States v. Waddell, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884); the right of citizens in custody of a United States Marshal to be free from assault, Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892), and the right to inform on violations of federal laws, In Re Quarles, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895), Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900): and pointing out further that rights, albeit federal rights, which do not arise from the relationship of the individual to the Federal Government and which arise only by reason of the Fourteenth Amendment's guaranty of protection against action by or on behalf of the States are not covered by § 242, for instance, United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876), where the defendants under the 4th and 12th counts were charged with having violated § 241, their charged intent being to prevent and hinder citizens of African descent and persons of color in "the free exercise and enjoyment of their several right [sic] and privilege [sic] to the full and equal benefit of all laws and proceedings, then and there, before that time, enacted or ordained by the said State of Louisiana and by the United States; and then and there, at that time, being in force in the said State and District of Louisiana aforesaid, for the security of their respective persons and property, then and there, at that time enjoyed at and within said State and District of Louisiana by white persons being citizens of said State of Louisiana and the United States, for the protection of the persons and property of said white citizens", and where the court said:

"The Fourteenth Amendment prohibits a State from denying to any person within its jurisdiction the equal protection of the laws; but this provision does not, any more than the one which precedes it and which we have just considered, add anything to the rights which one citizen has under the Constitution against another. The equality of the rights of citizens is a principle of republicanism. Every republican government is in duty bound to protect all its citizens in the enjoyment of this principle, if within its power. That duty was originally assumed by the States; and it still remains there. The only obligation resting upon the United States is to see that the States do not deny the right. This the Amendment guaranties [sic] but no more. The power of the National Government is limited to the enforcement of this guaranty."

In the Williams case the Supreme Court also relied upon the following cases: Hodges v. United States, 203 U.S. 1, 18, 27 S.Ct. 6, 51 L.Ed. 65 (1906), holding that the United States has no jurisdiction under the Thirteenth Amendment or under § 241 of a charge of conspiracy by individuals not under color of law to prevent citizens of African descent, be-

cause of their race and color, from making or carrying out contracts and agreements to labor and that the effect of the War Amendments was to abolish slavery and to make the emancipated slaves citizens, not wards of the nation, the nation "believing that thereby in the long run their best interests would be subserved, they taking their chances with other citizens in the states where they should make their homes," and holding further that "they [members of the African race] took no more from the Amendment [13th] than any other citizens of the United States"; United States v. Wheeler, 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 271 (1920), holding that a conspiracy by individuals not under color of law to deprive citizens of the United States of their right to remain in a particular state by seizing them and deporting them to another state, is not a violation of § 241, and that the privilege of passing from state to state is not an attribute of national citizenship, but is one of those privileges which belong by right to the citizens of all free governments, distinguishing on the latter point the earlier cases, Crandall v. State of Nevada, 6 Wall. 35, 18 L.Ed. 745, and Twining v. State of New Jersey, 211 U.S. 78, 97, 29 S.Ct. 14, 53 L.Ed. 97, 105; United States v. Powell, 212 U.S. 564, 29 S.Ct. 690, 53 L.Ed. 653, affirming Per Curiam United States v. Powell, 5 Cir., 151 F. 648, holding that participants in a mob which seized a Negro from the custody of a local sheriff and lynched him were not indictable under § 241 (see United States v. Williams, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758); and Baldwin v. Franks, 120 U.S. 678, 75 S.Ct. 656, 30 L.Ed. 766, holding that a conspiracy to drive *aliens* from their homes is not an offense under § 241, since it is expressly limited to interference with *citizens*.

Of particular interest to this court is the fact pointed out by Mr. Justice Frankfurter in footnote 8 to the Williams case that the indictment in the famous case of Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, which originated in this court, contained three counts, count 1 laying a charge under § 241; count 2, under § 242, and count 3, under § 242 in connection with the general conspiracy statute. Count 1 was very much like the indictment at bar, except that it identified two of its three defendants as state officers and went on to charge that these two officers and the third defendant did conspire to injure and oppress a named Negro citizen of the United States and an inhabitant of the State of Georgia in the free exercise and enjoyment of rights, privileges and immunities secured to said Negro citizen by the Constitution and the laws of the United States, to-wit, the right to be secure in his person and to be immune from illegal assault and battery; the right and privilege not to be deprived of liberty and life without due process of law; the right and privilege not to be denied equal protection of the law; the right and privilege not to be subjected to different punishments, pains and penalties by reason of his race and color than are prescribed for the punishment of other citizens; the right and privilege to be tried upon the charge for which he had been arrested by due process of law and, if found guilty, to be sentenced and punished in accordance with the laws of the State of Georgia; all of said rights, privileges and immunities being secured to the said Negro citizen by the Fourteenth Amendment to the Constitution of the United States as against any person vested with and acting under the authority of the State of Georgia; and then set out the plan and purpose by which the objectives of the conspiracy were to be accomplished. The defendants filed a motion to dismiss or quash each of the three counts, and Judge Bascom S. Deaver signed a memorandum opinion overruling the motions as to counts 2 and 3, but sustaining the motion as to count 1, saying: "section 51 [now 241], as construed by this court was not intended to cover a transaction such as is alleged in the first count." It is significant that the Government did not challenge that ruling as to count 1,

although under the Criminal Appeals Act of 1907, 18 U.S.C.A. § 3731, the Government could have secured a review in the Supreme Court. The Government's failure to appeal Judge Deaver's ruling is consistent with its concession in its brief filed in Hodges v. United States, supra, and quoted in the decision of said case, 203 U.S. at page 18, 27 S.Ct. at page 9, which concession, after referring to certain decisions of the Supreme Court, said:

> "With these decisions, and many others that might be cited, before us, it is vain to contend that the Federal Constitution secures to a citizen of the United States the right to work at a given occupation or particular calling free from injury, oppression, or interference by individual citizens.

> "Even though such right be a natural or inalienable right, the duty of protecting the citizen in the enjoyment of such right, free from individual interference, rests alone with the state.

> "Unless, therefore, the additional element to wit, the infliction of an injury upon one individual citizen by another, solely on account of his color, be sufficient ground to redress such injury, the individual citizen suffering such injury must be left for redress of his grievance to the state laws."

Indeed, the failure to appeal Judge Deaver's ruling is of added significance because Count 1 of the Screws indictment alleged that among the rights of which the Negro citizen was to be deprived was "the right and privilege not to be denied equal protection of the laws; the right and privilege not to be subjected to different punishment, pains and and penalties by reason of his race and color than are prescribed for the punishment of other citizens."

Two decisions regarding the rights of citizens in reference to labor organizations are of interest and are consistent with the views here expressed. In Unit-

ed States v. Moore, 129 F. 630 (Circuit Court, N.D.Ala., S.D., 1904), it is held that the right of miners to organize is not a right or privilege coming within § 241, and that the enforcement of such right depends entirely upon the States. The case of United States v. Bailes, 120 F.Supp. 614 (S.D.W.Va.1954), brings that holding up to date, applying it to the right of citizens to refrain from joining a labor organization even though the National Labor Relations Act, a statute tracing its validity to the Commerce Clause of the Constitution, secures such right as against employers, labor unions, and agents. These cases recognize that these rights of citizens to join or not to join labor organizations are fundamental rights of citizens in all free governments, and the Bailes case recognizes the fact that such rights, even though recognized by an Act of Congress, do not become rights of a citizen of the United States as such. See also United States v. Berke Cake Co., 50 F.Supp. 311, (E.D.N.Y. 1943), rejecting the Government's attempt to bring within the scope of § 241 the rights of employees recognized by the Fair Labor Standards Act, which, of course, traces its validity to the Commerce Clause.

 This court is convinced that the five numerical paragraphs of rights and privileges set forth in this indictment are not federal citizenship rights and privileges; not "federal rights and privileges which appertain to citizens as such", 179 F.2d at 648, and do not come within the scope of § 241, but are rights and privileges which are in their nature fundamental, and which belong of right to all citizens of all free governments, and which have belonged to all the free citizens of the several states ever since those states became free, independent and sovereign. For a discussion of these fundamental rights and privileges, see Corfield v. Coryell, 4 Wash.C.C. 371, and the Slaughter-House cases, 16 Wall. 36, 76, 83 U.S. 36, 76, 21 L.Ed. 394, 408. Insofar as said five paragraphs of rights and privileges embrace the right to be free from discrimination by reason of

race or color, such rights are Fourteenth Amendment rights, which, as we have seen, are not encompassed by § 241. The Government contends that the rights enumerated in paragraph 1 stem from Title 2 of the Civil Rights Act of 1964, and thus automatically come within the purview of § 241. The Government conceded on oral argument that paragraph one would add nothing to the indictment absent the Act. It is not clear how the rights mentioned in paragraph one can be said to come from the Act because § 201(a), upon which the draftsman doubtless relied, lists the essential element "without discrimination or segregation on the ground of race, color, religion, or national origin." This element is omitted from paragraph one of the indictment, and does not appear in the charging part of the indictment. The Supreme Court said in Cruikshank, supra, 92 U.S. at page 556, where deprivation of right to vote was involved,

> "We may suspect that 'race' was the cause of the hostility; but it is not so averred. This is material to a description of the substance of the offense and cannot be supplied by implication. Everything essential must be charged positively, not inferentially. The defect here is not in form, but in substance."

The contention as to the rights and privileges specified in paragraphs 2 through 5 is that they are derived from the Fourteenth Amendment, and may be vindicated by prosecutions under § 241. As we have previously seen, this does not follow. Additionally, the Government contends that the rights and privileges set forth in paragraphs 2 and 3 are derived from Title 3 of the Act dealing with public facilities and that the right and privilege described in paragraph 4 is a right arising from the substantive powers of the Federal Government and thus falls within the protection of § 241. We think it clearly appears from the authorities above cited that tracing a right or privilege to the Fourteenth Amendment does not entitle it to coverage under § 241. We think it clear also that

the right asserted in paragraph 4 to travel freely to and from the State of Georgia and to use highway facilities and other instrumentalities of the State in interstate commerce within the State of Georgia is not an attribute of national citizenship. See United States v. Wheeler, supra. Travel rights including free ingress to a State and egress therefrom are rights inherent in citizens of all free governments including citizens of all the States and the States have full authority to punish violations of this fundamental right. United States v. Wheeler, supra, 254 U.S. at 293, 41 S.Ct. at 134. These rights were not created, or granted, by the Federal Constitution. Article IV of the Articles of Confederation recognized these rights as belonging to the "free citizens in the several States" and stipulated that "the people of each State shall have free ingress and regress to and from any other State * * *." Article IV, sec. 2 of the Constitution "plainly intended to preserve and enforce the limitation as to discrimination imposed upon the states by article 4 of the [Articles of] Confederation, and thus necessarily assumed the continued possession by the states of the reserved power to deal with free residence, ingress and egress * * *." United States v. Wheeler, supra, 254 U.S. at 294, 41 S.Ct. at 134. Thus, these ordinary and usual travel rights are not federal citizenship rights and do not become such by virtue of the exercise of the Congressional power to regulate interstate commerce under Article I, sec. 8, of the Constitution. Regulation is not tantamount to creation, and if it were the creation would be for inhabitants and citizens of states generally and not exclusively for citizens of the United States.

Similarly, as we have seen, the Fourteenth Amendment did not create, grant or secure federal citizenship rights. It broadened the base of citizenship. It increased the number of citizens. It did not increase the rights of State citizens or of federal citizens as against other citizens. It made citizens of those who

had theretofore not been citizens. The post-bellum Amendments neither separately nor collectively made these new citizens wards of the Federal Government like the Indian tribes, for instance. The Supreme Court has said that members of the African race "took no more from the [13th] Amendment than any other citizens of the United States" and that the emancipated slaves were required by these Amendments to take "their chances with other citizens in the states where they should make their homes." Hodges v. United States, 203 U.S. 1, 18–20, 27 S.Ct. 6, 9, 10, 51 L.Ed. 65, 69–70 (1906). As pointed out by the Supreme Court in the Cruikshank case in 1876, "the equality of the rights of citizens is a principle of republicanism." Each State is duty bound to protect all its citizens in the enjoyment of this principle of the equality of rights. This right to equality is not a federally created, granted, or secured right. The Fourteenth Amendment merely grants a guaranty against denial of equal protection by the States, and the power of the Federal Government is limited to the enforcement of this guaranty. See United States v. Cruikshank, supra, 92 U.S. at 554.

We feel certain also, as was conceded by the Government on oral argument, that paragraph 5 of the indictment referring to "other rights exercised and enjoyed by white citizens in the vicinity of Athens, Georgia" contributes nothing toward the validity of the indictment because of the element of vagueness. This matter of vagueness will be discussed later.

Having decided that none of these rights and privileges are federal citizenship rights and privileges, that none of

them appertain to federal citizenship as such, we need go no further. We are convinced, however, that the Civil Rights Act of 1964 in no way aids the prosecution. It seems crystal clear that the Congress in enacting the Civil Rights Act of 1964 did not intend to subject anyone to any possible criminal penalties except those specifically provided for in the Act itself. Throughout the Act are provisions for injunctive relief, including restraining orders and temporary and permanent injunctions. Section 1101, in part, reads:

"In any proceeding for criminal contempt arising under title II, III, IV, V, VI, or VII of this Act, the accused, upon demand therefor, shall be entitled to a trial by jury, which shall conform as near as may be to the practice in criminal cases. Upon conviction, the accused shall not be fined more than $1,000 or imprisoned for more than six months."

and § 207(b) says:

"The remedies provided in this title shall be the exclusive means of enforcing the rights based on this title, but nothing in this title shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law not inconsistent with this title, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right."

The Congress could hardly have made plainer its intention not to bring into play the ninety-four year old ten year felony statute.[4]

---

4. Senator Humphrey, the leading spokesman for the Civil Rights Act, explained subsection 207(b) in a speech delivered on the floor of the Senate on May 1, 1964, as follows:

"The clause which reads that 'the remedies provided in this Title shall be the exclusive means of enforcing the rights hereby created' is designed to make clear that a violation of sections 201 and 202

cannot result in criminal prosecution of the violator or in a judgment of money damages against him. This language is necessary because otherwise it could be contended that a violation of these provisions would result in criminal liability under 18 U.S.C. 241 or 242 * * *. Thus, the first clause in section [207(b)] simply expresses the intention of Congress that the rights created by Title II

Indeed, in the recent case of Heart of Atlanta Motel Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (Dec. 14, 1964), the Supreme Court, after an analysis of Title II of the Act, concludes that under it "remedies are limited to civil actions for preventive relief."

In the Williams case, decided in 1950, the Supreme Court pointed out that these §§ 241 and 242 had in the various codifications been considered by Congress subsequent to their original enactment, not once but four times, without any change in substance, notwithstanding the Court's consistent course of decisions, dating from Cruikshank in 1876, indicating that § 241 was in practice interpreted to protect only rights arising from the existence and powers of the Federal Government. Now fourteen years later it can perhaps even more significantly be observed that the Congress, even with the Williams decisions before it and in the light of the careful consideration given to the entire subject of civil rights incident to the passage of the Civil Rights Act of 1964, has chosen not to broaden the long standing interpretations of this section. Both of the Williams decisions were careful not to question the power of the Congress to enforce by appropriate criminal sanctions every right guaranteed by the Due Process Clause of the Fourteenth Amendment. The question of the power of the Congress under the Constitution to legislate in this field is not here in question. This important matter of "the wise adjustment between State responsibility and national control of essentially local affairs", 341 U.S. 70, 73, 71 S.Ct. 581, 582, is the responsibility of the Congress. The courts are not to invade this field beyond the manifest Congressional intent.

The fact that the Williams cases were decided by divided courts, 2 to 1 in the court of appeals, and 5 to 4 in the Supreme Court, and the fact that one of the Supreme Court Justices concurred in the majority opinion upon grounds other than those expressed in the opinion written by Mr. Justice Frankfurter for the majority, does not militate against the soundness of the views expressed in the majority and controlling opinions. Each of these decisions, though lacking unanimity, is a binding precedent upon this court under the familiar doctrine of *stare decisis*.

Moreover, it follows from the Screws decision by the Supreme Court and from the Williams decision by the court of appeals that any broader construction of § 241 than to cover only federal citizenship rights as such would render it void for indefiniteness.[5]

The court of appeals in Williams said:

"The failure [of § 241 to create a crime if such broader interpretation be given it] lies in the application of the statute to the provision of the Fourteenth Amendment, 'Nor shall any State deprive any person of life, liberty, or property, without due process of law', because of the extreme vagueness of the quoted clause. Reference is made to the discussions of a similar question touching Sec. 20 in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330, wherein by a closely divided court that statute was upheld because it provided that 'wilful' violations only were to be crimes, and that meant that the accused, exercising the power of the State, not only deprived another of a federally secured right, but knew it was such, and wilfully flouted the Constitution and laws

may be enforced only as provided in Title II. This would mean, for example, that a proprietor in the first instance, legitimately but erroneously believes his establishment is not covered by section 201 or section 202 need not fear a jail sen-

tence or a damage action if his judgment as to the coverage of Title II is wrong."

5. The Supreme Court did not reach the question of vagueness in the Williams case.

of the United States. This indictment does not charge these defendants with 'wilfulness' nor does the statute mention it, and the judge refused to give the jury on request charges that 'wilfulness' was a necessary element of the case.

"2. The Congress and the federal court are themselves faced here with the provisions of the Fifth Amendment that 'No person shall * * * be deprived of life, liberty, or property, without due process of law', and it is found right in the midst of provisions in the Fifth and Sixth Amendments about federal prosecutions for crime. It is well understood that 'due process' applies not only to court procedure, but also to legislation, especially in criminal matters. There are no common law federal crimes, but all are created by statute, though common law words in the statute may take their intended meaning from the common law. Not only must the accusation inform the accused for what he is to be tried, but due process requires that the statute must inform the citizen in advance by a reasonably ascertainable standard what the crime shall be. A judge may not establish the standard, save by reasonable interpretation after the deed is done, for that is in substance to give the statute life *ex post facto*, which the Constitution forbids also. All this we understood to be admitted by all the justices in the opinions in the Screws case. The word 'wilful' in Sec. 20 was held by the majority to mean that the accused knew that the federal right existed and intentionally and purposely violated it, and his knowledge and wilfulness

made him a criminal." 179 F.2d at 647.

The court of appeals held further that while the word "conspire" has some connotation of criminality it does not have the force of the word "wilfully" appearing in § 242, and that it was solely because of the word "wilfully" so appearing that the Supreme Court, in Screws, held § 242 valid. The Supreme Court, in Screws, recognized that "if the Act falls by reason of vagueness so far as due process of law is concerned, there would seem to be a similar lack of specificity when the privileges and immunities clause * * * and the equal protection clause * * * of the Fourteenth Amendment are involved." Screws v. United States, 325 U.S. 91, 100, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495, 1502.[6]

Certainly all law-abiding liberty-loving citizens would feel that if the defendants did what the indictment charges they should be tried, and if, after a fair trial, convicted, that they should be appropriately punished; but the question is by what authority should they be tried, and if, after a fair trial, convicted appropriately punished. The enforcement of general criminal laws is a local matter with authority and responsibility resting squarely and solely upon local city, county and state governmental authorities. It is common knowledge that two of the defendants, Sims and Myers, have already been prosecuted in the Superior Court of Madison County, Georgia for the murder of Lemuel A. Penn and by a jury found not guilty. As important and desirable as it is that the defendants be tried where not already tried, and if, after a fair trial, convicted that they be appropriately punished, it is equally important that this court not usurp jurisdiction where it has none.

6. This element of vagueness proves fatal to State statutes. For instance, Georgia's insurrection statute, Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; Georgia's statute against unlawful assemblies for the purpose of disturbing the peace, Wright v. Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349.

It has had the same effect upon South Carolina's common law crime of breach of the peace, Edwards v. State of South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, and Louisiana's Breach of Peace Statute Cox v. State of La., 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471.

488

Fortunately, under the Criminal Appeals Act, 18 U.S.C.A. § 3731, the Government has a speedy remedy for a review of this ruling by the Supreme Court, and if it be there adjudicated that this indictment is valid a trial can yet be had.

Let an order be entered sustaining the defendants' motions to dismiss.